**In The Interest of R.P., A Minor,**

**Appeal of K.P., Appellant.**

**In The Interest of L.P., A Minor,**

**Appeal of K.P., Appellant.**

Superior Court of Pennsylvania.

Submitted May 12, 2008.
Filed Aug. 21, 2008.
Reargument Denied Oct. 29, 2008.

Paul Sotak, Scranton, Brenda M. Kobal, Moosic and Kim A. Giombetti, Scsranton, for appellant.

Stacey Beecher, Milford, for appellee.

Romilda P. Crocamo, Scranton, for Justice Center, Amicus Curiae.

William V. Peters, Clark Summit, for J.P., Participating Party.

Matthew J. Galasso, Milford, for R.P. and L.P., Participating Parties.

BEFORE: FORD ELLIOTT, P.J., BOWES and COLVILLE,* JJ.

OPINION BY BOWES, J.:

¶ 1 This is an appeal by K.P. ("Mother")[1] from the October 4, 2007 order adjudicating her children, L.P., born July 21, 2003, and R.P., born February 20, 2006, dependent. L.P. and R.P., who are not consanguineous, were adopted from different orphanages in Russia. L.P. was adopted in June 2004, and R.P. was adopted in June 2007, only two months before suffering brutal, life-threatening physical abuse at the hands of Father. N.T., 9/17/07, at 18–19. They were de-

---

* Retired Senior Judge assigned to the Superior Court.

1. J.P. ("Father") has not filed an appeal from the dependency adjudication.

clared dependent children after the trial court found that Mother was a perpetrator by omission of R.P.'s abuse. As the court also found aggravated circumstances, the October 4, 2007 order provided that no further efforts to preserve or reunify the family were necessary. Following our exhaustive review of the notes of testimony, relevant case law, and arguments of the parties, we affirm.

¶ 2 On August 26, 2007, Mother and Father (collectively referred to as "Parents") arrived at the Bon Secours Community Hospital Emergency Room ("ER") at 8:20 p.m. with eighteen-month-old R.P., who was in critical condition. N.T., 9/12/07, at 70. Christina Robbin, a registered nurse and certified forensic examiner who was outside on break, observed Father performing mouth-to-mouth resuscitation on R.P. *Id.* at 95–97, 112. Father informed the nurse that R.P. had just fallen from a trampoline. *Id.* at 97–98. R.P., who was wearing only a diaper, had approximately 100 bruises of varying coloration all over his body. *Id.* at 103. Ms. Robbin explained that although healing times vary among individuals, generally blue bruises indicate injury within the past twenty-four hours, brown bruises signify injury within about forty-eight hours, and green or yellow bruises designate an injury occurring at least three days prior. *Id.* at 122.

¶ 3 Registered nurse Heidi Ann Clouse told Father, whose demeanor she described as "very flat and emotionless," *id.* at 85, to place R.P. on a stretcher. She then began using an Ambu bag [2] to provide ventilation for R.P. since he was breathing inadequately. *Id.* at 84. Ms. Clouse assumed care for R.P. from the time of his arrival at the ER until he subsequently was transferred to another hospital, as detailed *infra*, later that night. *Id.* at 85–86, 89.

¶ 4 Dr. Emmanuel Martakis, who examined R.P. in the ER, confirmed the extent of the bruising and noted that many of the bruises were more than twenty-four hours old. *Id.* at 79. When Dr. Martakis first saw R.P., the child was intubated, sedated, and unresponsive. Father, who was at the bedside, repeated to Dr. Martakis that R.P. had fallen from a trampoline. In examining R.P., Dr. Martakis noticed a Battle's sign,[3] which is indicative of a skull fracture, behind the child's right ear, several healing cuts on his scalp, and numerous bruises on his face. Additionally, Dr. Martakis observed bruises on R.P.'s back, buttocks, upper arms, chest, arm pits, legs, hands and feet, ranging from red to purple, brown, and green in color. *Id.* at 68. A CAT scan revealed that R.P. suffered a right occipital skull fracture and a bilateral subdural hematoma. A skeletal survey revealed a healing wrist fracture and a possible hip fracture. *Id.* at 20–22, 52.

2.  An Ambu bag, or manual resuscitator, "is one of the most common devices used to ventilate and oxygenate patients in medical practice." They "are principally used for transport and at the site of emergencies, especially by paramedics and emergency room staff[.]" Ahmad Elsharydah, *Manual Resuscitators (Ambu Bags) Can Ventilate The Lungs Adequately Despite Big Subatmospheric Pressure In The Breathing Circuit*, 7 THE INTERNET JOURNAL OF ANESTHESIOLOGY 2 (2003), ¶ 1, 8, at http://www.ispub.com/ostia/i ndex.php?xmlFilePath=journals/ija/vol7n2/gast ric.xml.

3.  This identifiable mark is named after William Henry Battle, an English surgeon born in 1855. In medical terminology, Battle's sign is a bruise immediately behind the ears, indicative of fracture of the base of the posterior portion of the skull and suggests the possibility of underlying brain trauma. Mark E. Williams, M.D., *Physical Assessment of the Elderly Patient: The Head*, MedScape, June 21, 2006, http://www.medscape.com/viewprogram/5576. *See also* N.T., 9/12/07, at 73–74.

¶ 5 During R.P.'s examination, Father accompanied the child; Mother entered the ER with four-year-old L.P. and was directed to the waiting room, or "solace room." N.T., 9/12/07, at 114. Approximately fifteen minutes later, Mother telephoned the children's paternal grandparents ("Grandparents"), who arrived at the ER at 9:30 p.m. Shortly thereafter, Mother left L.P. with Grandparents and visited R.P.'s bedside, where she encountered Father, medical personnel, and two Pennsylvania State Police Troopers.

¶ 6 Pennsylvania State Police Corporal Paul Cavallaro, the supervisor of the criminal investigation unit, spoke first with an ER doctor, then to Father alone, followed by Mother alone, and finally, to Parents together. *Id.* at 206. Mother told police that she had last bathed R.P. that morning and had not observed any bruises. *Id.* at 197, 201, 212. Father told police he was jumping on the trampoline with R.P., and when he turned his back, the child fell, such that Father could only see the child's feet. *Id.* at 203. During police questioning with both Parents present, Mother recounted that R.P. had fallen down stairs two days earlier when the family's dog knocked him over. She stated that "[h]e would slip down the stairs every once in awhile." *Id.* at 196, 211. Additionally, Mother explained that both R.P. and L.P. had to be held down while bathing due to traumatic experiences they encountered in Russian orphanages. *Id.* at 196, 197, 200–01.

¶ 7 Jennifer Dargenio, an intake caseworker for Appellee Pike County Children and Youth Services ("CYS"), received a telephone call from ChildLine[4] at 9:30 p.m. on August 26, 2007, regarding R.P. Ms. Dargenio arrived at the hospital between 10:15 and 10:30 p.m. and questioned Parents by the child's bedside at approximately 11:45 p.m. When Ms. Dargenio asked about the child's injuries, Father reiterated that R.P. had fallen from a trampoline, while Mother maintained that the baby had recently twice fallen down stairs. Parents also stated that R.P. was a typical clumsy eighteen-month-old toddler, who had just started to walk. N.T., 9/17/07, at 9.

¶ 8 Due to R.P.'s critical condition, he was flown to the Maria Fareri Children's Hospital Pediatric Intensive Care Unit at Westchester Medical Center in the early morning hours of August 27, 2007. Forensic Pediatrician Dr. Jennifer Canter[5] examined R.P. on August 29, 2007. After reviewing the child's initial medical evaluation noting R.P.'s extensive bruising, the skull fracture, and talking to Parents, Dr. Canter requested consultations with an endocrinologist, a hematologist, an orthopedist, a radiologist, and an ophthalmologist to determine the consistency between R.P.'s medical history and his injuries. N.T., 9/12/07, at 15. Those evaluations revealed conditions establishing Shaken Baby Syndrome. The symptoms included a Battle's sign, a skull fracture, a healing wrist fracture, a possible hip fracture, a bilateral subdural hematoma, and retinal hemorrhaging.

4. The ChildLine Registry is a Department of Public Welfare unit "that operates a statewide toll-free system for receiving reports of suspected child abuse, refers the reports for investigation, and maintains the reports in the appropriate file. 55 Pa.Code § 3490.4; 23 Pa.C.S. § 6332." *C.F. v. Pennsylvania Department of Public Welfare*, 804 A.2d 755, 757 n. 3 (Pa.Cmwlth.2002).

5. Dr. Canter is the Medical Director of Children's Advocacy for Westchester County, New York, the Director of Child Protection at the Maria Fareri Children's Hospital at Westchester Medical Center, and Assistant Professor in Pediatrics at the New York Medical College. *Id.* at 13.

¶ 9 Dr. Canter's examination demonstrated that R.P. had a purplish-red bruise on his ear, a yellow bruise on his buttocks, and a cluster of yellow, one centimeter circular bruises on his upper left arm consistent with a hand mark. The expert explained the subdural hematoma utilizing the following analogy:

[I]f you think of the brain as a blob of jello and you think of saran wrap overlying the brain and then that entire thing placed into a glass bowl, the jello represents the brain. The saran wrap represents the dura or the overlying tissue on the brain and the skull is represented by the glass bowl. The subdural space is the space in-between the saran wrap and the jello. And that subdural space is where the blood was. There is also a space called the epidural space and that is the space between the saran wrap and the glass bowl. And [R.P.]'s blood was isolated in that subdural space and the blood specifically in that area is concerning for abuse because the mechanism of injury in that space is not a short fall. It is not a fall down the stairs. It is not a fall off a trampoline.

*Id.* at 21.

¶ 10 Ophthalmologist Dr. Robert Barry Josephberg, Chief of the Retina and Vitreous Department at Westchester Medical Center and an instructor at New York Medical College, examined R.P. on August 30, 2007, to determine the extent of his eye injuries. *Id.* at 221, 229–30. In evaluating the child's retinas, Dr. Josephberg observed minimal damage to the right eye, with five to ten blot hemorrhages present in the back of the eye. *Id.* at 223. When he examined the left eye, however, he observed over 100 hemorrhages "throughout the retina from in front of the retina to within the retina to under the retina and out to the far peripheral of the retina. So it was almost as extensive hemorrhaging as you could imagine an eye could have." *Id.* at 224. Within a reasonable degree of medical certainty, Dr. Josephberg concluded that the hemorrhaging "definitely [was] not" caused by a fall from a trampoline and opined that the child had suffered an acceleration-deceleration injury due to forceful shaking. *Id.* at 228.

¶ 11 CYS, beginning to piece together the puzzle of R.P.'s injuries, allowed Grandparents to take temporary custody of L.P. on August 27, 2007, with a safety plan in place providing that the child had to be supervised during any visitation with Parents. On August 31, 2007, however, CYS filed a petition for emergency protective custody, which the court granted, removing L.P. from Grandparents' care based on the fact that they lived across the street from Parents and knew or should have known that R.P. was an abused child.

¶ 12 At trial, CYS intake supervisor Stacy DeGroat presented the agency's recommendation that L.P. and R.P. be declared dependent children with no kinship reunification plan due to the presence of aggravated circumstances. *Id.* at 321. Following hearings on September 12 and 17, 2007, and October 4, 2007, the trial court found the children to be dependent on October 4, 2007. The court further determined that aggravated circumstances existed as to both Mother and Father. This appeal by Mother followed.

¶ 13 As Mother's statement of questions involved in this appeal is repetitious, we summarize the issues she raises as follows: Whether the trial court properly 1) determined that the children were dependent; 2) found the existence of aggravated circumstances; 3) placed the children in foster care; 4) prevented counsel's review of notes used by witnesses to refresh recollection; and 5) permitted L.P.'s statement

pursuant to the Tender Years Hearsay Act.[6]

¶ 14 Our standard of review in dependency cases is well established; the standard this Court employs is broad. We accept the trial court's factual findings that are supported by the record, and defer to the court's credibility determinations. *In re G.T.*, 845 A.2d 870 (Pa.Super.2004). We accord great weight to this function of the hearing judge because he is in the position to observe and rule upon the credibility of the witnesses and the parties who appear before him. *In re E.P.*, 841 A.2d 128 (Pa.Super.2003). "Relying upon his unique posture, we will not overrule [the trial court's] findings if they are supported by competent evidence." *In re B.B.*, 745 A.2d 620, 622 (Pa.Super.1999) (citations omitted).

¶ 15 Our Supreme Court, in *In re M.L.*, 562 Pa. 646, 757 A.2d 849, 850–51 (2000), stated that a court:

is empowered by 42 Pa.C.S. § 6341(a) and (c) to make a finding that a child is dependent if the child meets the statutory definition by clear and convincing evidence. If the court finds that the child is dependent, then the court may make an appropriate disposition of the child to protect the child's physical, mental and moral welfare, including allowing the child to remain with the parents subject to supervision, transferring temporary legal custody to a relative or a private or public agency, or transferring custody to the juvenile court of another state. 42 Pa.C.S. § 6351(a).

*See also In re D.A.*, 801 A.2d 614 (Pa.Super.2002) (en banc). A dependent child is one who:

is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk, including evidence of the parent's, guardian's or other custodian's use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk[.]

42 Pa.C.S. § 6302(1).

¶ 16 The instant record supports the finding of dependency and the trial court's conclusion that the testimony indicated that Mother was aware of R.P.'s injuries. In order to support an adjudication of dependency, the Juvenile Act does not require proof that the parent has committed or condoned abuse, but merely evidence that the child is without proper parental care. *In re R.R.*, 455 Pa.Super. 1,

6. The Barbara J. Hart Justice Center ("Center"), a project of the Women's Resource Center and a private non-profit organization that, *inter alia*, advocates on behalf of victims of domestic violence and their minor children, has filed an *amicus* brief in support of Mother. The premise for the Center's argument is that Mother is a battered woman and a victim of domestic violence perpetrated on her by Father, and as such, she should not be considered a risk to her children. While Mother testified Father "has a short fuse," he had pushed and shoved her over a year ago, and he "has some temper issues," she presented no evidence that she is a victim of domestic violence, nor does she assert any issue that such a status prevents our proper application of the Juvenile Act. N.T., 9/17/07, at 123–24. As it is "settled that an *amicus* 'cannot raise issues that have not been preserved by the parties,' ... and 'cannot inject new issues into a case which have **not** been presented by the parties,' " we will not address this claim. *Alliance Home of Carlisle v. Board of Assessment Appeals*, 591 Pa. 436, 919 A.2d 206, 221 n. 8 (2007) (citations omitted) (emphasis in original).

686 A.2d 1316, 1317–18 (1996); *see also* 42 Pa.C.S. § 6302(1) (explaining that a determination of lack of parental control may be based upon evidence of conduct by the parent that places the health, safety, or welfare of the child at risk). In determining whether there exists proper care, acts and omissions of a parent must weigh equally since parental duty includes protection of a child from the harm others may inflict. *In re R.W.J.*, 826 A.2d 10 (Pa.Super.2003).

¶ 17 Mother contends that there is a dearth of clear and convincing evidence demonstrating that she knew or should have known about R.P.'s abuse. Pointing out that many of R.P.'s bruises were bright red and therefore fresh, and referencing physicians' testimony that many of R.P.'s injuries could have occurred during the same event, Mother avers that she could not have protected R.P. from the August 26, 2007 abuse. With respect to the remainder of the bruises on R.P.'s body, Mother offers a multitude of possible explanations that rule out her purported omission, including R.P.'s falls down stairs, his baths, his fall in his crib, his habitual pinching and hand biting, a recognized bruise on the forehead, and rough play with L.P. and the family dog. Mother's brief at 19; N.T., 9/17/07, at 13–16, 20–21, 36–41.

¶ 18 Mother places further emphasis on twenty-eight summer photographs of L.P. and R.P. dated from June 14, 2007, through August 17, 2007, showing the children in bathing suits or summer clothing and without any visible injuries. She asserts that many individuals saw the children in public prior to August 26, 2007, and would have noticed signs of abuse.

¶ 19 The trial court concluded, and the record supports, that R.P.'s injuries would not have occurred if the children had been under the proper care and control of Parents. *See In the Interest of J.R.W.*, 428 Pa.Super. 597, 631 A.2d 1019, 1024 (1993) (explaining that a finding of abuse requires merely *prima facie* evidence that the abuse normally would not have occurred except for the acts or omissions of the parents). R.P., in addition to his other severe injuries, had suffered over 100 bruises of varying ages and patterns. Mother made ever-changing and often conflicting statements to police, CYS, and later to the trial court. She first claimed ignorance of the bruises and then admitted that she knew about them and even had questioned Father about some of the marks on the child. These facts refute Mother's claim.

¶ 20 Mother's admissions demonstrate not only her initial attempts to conceal the abuse but also her knowledge of the abuse and failure to protect her child. Significantly, the trial court found Mother's testimony to be "evasive, self-serving, inconsistent, and false," and concluded that Mother's aggravated physical neglect was "evidenced by her affirmative actions in seeking to conceal the existence and extent of the abuse from medical providers, investigators, and this Court." Trial Court Opinion, 12/21/07, at 2.

¶ 21 Mother's production of the twenty-eight photographs dating from the summer months of 2007 fails to support her claims. Twenty-five of the photographs were taken prior to August 4, 2007, more than three weeks prior to the incident in question; in the two pictures of R.P. taken on August 17, 2007, his clothing or the camera angle conceals the majority of his body. Moreover, as noted by CYS, anyone who saw the children in public would have been unable to observe the child's torso, buttocks, and upper arms hidden under clothing, where most of the bruising occurred. R.P. had over 100 bruises, some that Mother admitted to having seen and in-

deed, questioned Father about their origin. The following interaction between Mother and the trial court reveals Mother's observance of bruises on R.P., despite her earlier testimony that she never saw any, and her concomitant failure to protect against further occurrences.

Q [By the Court]: One of the photographs shows a significant bruise on [R.P.'s] buttocks. Did you ever see that bruise before?

A [By Mother]: Yes and it was explained to me by my husband.

Q: When did you make that inquiry?

A: I couldn't say exactly. Probably several days, possibly the week before.

Q: Did you ever see the bruising on [R.P.'s] arms?

A: On his forearm?

Q: On his upper arms?

A: Yes I did.

Q: When did you notice that?

A: Probably about the same time.

Q: Several days before?

A: Yes and I had asked what that was from as well. Do you want me to say—

Q: From the time that you first got [R.P.], which was in May of 2007?

A: Yes.

Q: Up until this couple of weeks before the 26th, before then did you notice any bruising? Like from May until the beginning of August?

A: Nothing that I thought was odd, no. **I would notice after [Father] had taken care of him on the weekend, I would notice bruises that wouldn't be there that hadn't been there prior to him taking care of him.** Nothing significant and nothing concerned me.

Q: With the sudden appearance of more significant bruising in August, didn't that cause you some concern?

A: I would say so.

Q: Did you do anything about it?

A: I questioned and I was answered as to what they were from.

Q: **Did you take any action beyond just simply questioning and getting an answer?**

A: **No I didn't. I was satisfied with the answer I was given.**

N.T., 10/4/07, at 107–08 (emphasis added).

¶ 22 Moreover, the trial court was correct in adjudicating L.P. dependent because there was clear and convincing evidence that R.P. was the victim of abuse. As noted by the trial court, "the Juvenile Act evidences a sensitivity to the safety and emotional well-being of children who, although not abused themselves, have a sibling who has been physically abused at the hand of a family member." *Id.* at 21 (citing *In re G.T., supra* at 873); *see also In re M.W.,* 842 A.2d 425 (Pa.Super.2004) (where one sibling is abused and found to be dependent, it is within trial court's discretion to determine other siblings are dependent even if they are not abused); *In re S.B.,* 833 A.2d 1116 (Pa.Super.2003) (same).

¶ 23 Mother, by her failure to protect her children from harm, has placed their future health, safety, and welfare at risk. Accordingly, since the children are without proper maternal control necessary for their physical, mental, and emotional health, the trial court's determination of dependency must be affirmed. 42 Pa.C.S. § 6302(1).

■ ¶ 24 Similarly, the trial court did not err in its conclusion that medical testimony provided clear and convincing evidence of Mother's knowledge of R.P.'s prior injuries. Mother claims that physicians' conflicting statements support her position that she may not have known of R.P.'s injuries. First, she points to Dr. Joseph-

berg's remark that he saw no bruises or unusual marks on R.P. during his August 30, 2007 examination of the child, despite the fact that only four days earlier, hospital staff and physicians had counted over 100 bruises on the child. Mother contends that since Dr. Josephberg was looking for bruises and failed to notice them, it is reasonable to conclude that she, too, might have missed the bruises. Mother suggests that the testimony of Dr. Josephberg, Dr. Canter, and Dr. Martakis that R.P.'s severe injuries happened during the same five-to-ten-second episode lends credibility to her argument that she was not aware of R.P.'s abuse.

¶ 25 Mother misrepresents Dr. Josephberg's testimony concerning the lack of bruising on and around R.P.'s eyes. When the expert witness noted that R.P. appeared outwardly normal, he clearly was referring to the condition of the child's eyes. He stated, "The white of the eye was totally normal. Basically, if you looked at the child you would think, not knowing what was inside, he had perfectly normal looking eyes." N.T., 9/12/07, at 222. Dr. Josephberg, who solely focused on R.P.'s face and eyes during the examination, reasonably would not have had information concerning the rest of the child's body. In fact, he was unaware that R.P. had suffered a skull fracture. *Id.* at 233. Dr. Josephberg was a retinal specialist whose sole purpose in examining R.P. was to evaluate the extent of the retinal hemorrhaging. He did not examine other parts of R.P.'s body, nor did he make representations concerning other injuries the child suffered.

¶ 26 Contrary to Mother's contentions, the thorough, unbiased evaluation of R.P.'s injuries and testimony presented by several physicians is sufficient to establish by clear and convincing evidence that Mother knew or should have known about Father's abuse of R.P. The baby presented at the hospital with horrific injuries. Dr. Canter expressed the extent to which she evaluated the child, in part because R.P. only recently had been brought into Parents' care and custody from Russia. Moreover, she had no knowledge of R.P.'s family history, which foreclosed immediate explanation of any genetic condition that might have predisposed the child to injury. *Id.* at 38. Dr. Canter explained,

> I want[ed] to be extremely thorough.
>
> ....
>
> I had a geneticist come see him. I want him to be evaluated for any genetic condition that may predispose him to the presentation he has. We don't know his family history. We don't know anything about him before he was adopted.... So I want to play it extra cautious and be extra safe and get every possible evaluation we have.

*Id.* at 37, 38.

¶ 27 The process of evaluation utilized by medical personnel in general, and Dr. Canter in particular, revealed a cautious, methodical, reasoned approach that did not embrace any unsupported theories concerning causation. Additionally, Dr. Canter noted that she conducted her evaluation without any preconceived opinion concerning the cause of R.P.'s injuries; it was only after evaluating the child in the context of the objective medical testing that she concluded R.P. was a victim of child abuse. Dr. Canter delineated:

> [W]hen I interviewed the parents, we didn't have any studies back. We didn't have confirmation on where the brain injury was. What type of—the ophthalmologist hadn't been up yet. The skeletal survey results weren't back. We had nothing. I was going in there fresh. I was going in there with a kid with some kind of injury to the brain. The parents report falling off the trampoline. I did

not want to be bias[ed] and look at all the information or examine [R.P.] before I spoke to them. So when I went in the room and heard this, you know, story of the fall off the trampoline, I basically said, okay, here are these parents telling me this story. I wrote every word down they said and I had no concern until I looked at the child and looked at all the studies . . . .

*Id.* at 43–44.

¶ 28 Within a reasonable degree of medical certainty, Dr. Canter opined that R.P.'s injuries did not occur as a result of a fall from a trampoline. While she left open the possibility that some of the injuries could have resulted from such a fall, she emphatically explained, "It is my opinion that the injuries [R.P.] present[ed] are not secondary to a fall off a trampoline, although he very well may have fallen off of a trampoline, it doesn't explain the injuries he has." *Id.* at 25. Specifically, the expert noted that the subdural hematoma and the retinal hemorrhages could not have resulted from a fall from a trampoline. *Id.* at 26. The following exchange between Dr. Canter and Father's counsel is revealing:

Q [By Father's counsel]: What would cause a subdural hematoma if it would be different from a fall from a trampoline?

A [Dr. Canter]: Some type of acceleration, deceleration for a great magnitude. That would not be consistent with a fall off a trampoline.

Q: Would an intervening—lets say a rock on the ground, would that have changed your opinion?

A: That would be impact.

Q: So that would not cause—

A: That would not cause the subdural hematoma and the retinal hemorrhages.

A: What could—

. . . .

A: If the fall did happen as the Father described, it would not explain the full component of his head trauma. It would only explain the fracture to the skull.

Q: The subdural hematoma and the eye injuries, could that occur from one particular impact or are you saying that that is from—

A: It did not occur from impact. Period. It occurred from some type of acceleration, deceleration force.

Q: Which is a blow, basically what you are saying?

A: No, acceleration deceleration force, a very violent forward and backward movement of the head. Such as would take place on a fall from more than six stories to the ground, from a high speed motor vehicle accident with a significant acceleration deceleration component of the head or from violent shaking.

Q: And would both of those injuries possibly have occurred from the same traumatic episode?

A: Which injuries?

Q: The bleeding—the subdural hematoma and the bleeding of the eyes.

A: Absolutely, they could have happened from the same violent acceleration deceleration force, but not from the trampoline. So for example if this child had been violently shaken and his head slammed you would have your skull fracture and your retinal hemorrhages and the subdural hematoma. If this child fell out of a six story window and had significant flailing of his head with an acceleration deceleration component and smashed to the concrete you would have this [compilation] of findings in rare circumstances. But add to that, that he has old bruises on specific areas that are

concerning for abuse and old fractures....

*Id.* at 27–29.

¶ 29 Dr. Andrea Taroli, the Medical Director of Pegasus Child Advocacy Center who specializes in pediatric forensics, described the extent and magnitude of the bruises R.P. suffered:

[H]e had bruises of varying shapes and size covering—

   ....

Basically covering most of [sic] not all body surface areas, across the scalp to his face, neck, chest, back, arms abdomen, buttocks, legs and feet and hands as well. The injuries—some of them had a pattern of knuckle marks, when someone is hit with a fist, the knuckles leave small round marks that occur in sets or lines in line with the knuckles.

*Id.* at 139.

¶ 30 In its brief, CYS summarized the extent of the bruising on R.P., as described by Dr. Taroli; our review of the record confirms its accuracy.

Large bruise on R.P.'s left buttock along with a reddened area at the top of the buttock near the lower back which was either an abrasion or a burn. (Petitioner's Exhibit 2, picture # 57; R154–157).

Bruises and superficial lacerations on R.P.'s palm on his right hand, bruising and swelling of the first, fourth and fifth fingers as well as peeling from the fifth finger. (Petitioner's Exhibit 2, pictures # 62, 71, 72; R158).

Healing abrasion to the left inside of the ankle. (Petitioner's Exhibit 2, picture # 20; R158–159, 164).

Bruising of the right foot. (Petitioner's Exhibit 2, picture # 24; R159).

Large bruise on R.P.'s right calf, puncture wounds on it. (Petitioner's Exhibit 2, picture # 25; R154–155, 160).

Scattered bruises on R.P.'s lower half of his body including a bruise on the left anterior thigh and bruising up over the anterior iliac crest; a large bruise above his left wrist and hand. (Petitioner's Exhibit 2, picture # 26; R154–156, 160).

Three sets of knuckle marks on the left rib cage in the mid axilary line; said knuckle mark patterns being from a fist. (Petitioner's Exhibit 2, picture # 27; R154–156, 160, 161).

Bruising of the left armpit. (Petitioner's Exhibit 2, picture # 29; R161–162).

Multi small round bruises scattered through the anterior chest and large bruise on the left upper arm with several additional fingertip bruises. (Petitioner's Exhibit 2, picture # 33; R154–166, 162).

Multiple bruising on the right upper arm and possibly under the right armpit. (Petitioner's Exhibit 2, picture # 37–38; R154–156, 162).

Swelling and abrasions of the great toe, both feet. (Petitioner's Exhibit 2, picture # 21; R.159).

Two large bruises behind the right ear and bruising of the right ear. (Petitioner's Exhibit 2, picture # 43; R154–156, 162–163).

Bruising on the right side of the face, including multiple bruises in the outer corner of the right eye, possibly in the arrangement of fist knuckle marks. (Petitioner's Exhibit 2, picture # 45; R154–156, 163).

Bruises on right side of the forehead and scalp. (Petitioner's Exhibit 2, picture # 47; R163).

Laceration of the scalp. (Petitioner's Exhibit 2, picture # 50; R163).

Knuckle marks and bruising on the left side of the face. (Petitioner's Exhibit 2, picture # 51 and # 53; R154–156, 164).

About 8 to 10 sets of knuckle marks on the back, as well as large bruises on the mid and lower back. (Petitioner's Exhibit 2, picture #55 and #56; R154–156, 164).

Abrasion or burn of upper buttock area. (Petitioner's Exhibit 2, picture #56; R164).

Bruising in between the fingers. (Petitioner's Exhibit 2, picture #64–67; R164).

CYS brief at 11–12; N.T., 9/12/07, at 139–49.

¶ 31 Clearly, the medical evidence substantiated that this baby boy was wounded to the point that he sustained painful, life-threatening injuries. This evidence, coupled with Parents' failure to satisfactorily explain the injuries, led the trial court to conclude that the children were without proper care and supervision. As we stated in *In re R.W.J., supra* at 14 (quoting *In the Interest of JOV*, 454 Pa.Super. 630, 686 A.2d 421, 423 (1996)) (emphasis added):

> [W]hen determining whether a parent is providing a minor with proper care and control ... the caretaker's acts **and omissions** should weigh equally. The parental duty extends beyond mere restraint from actively abusing a child; rather, there exists a duty to protect the child from the harm that others may inflict.

Thus, the trial court did not err in its determination that the medical testimony was not in conflict and that physicians' statements, in conjunction with medical findings and observations, provided clear and convincing evidence that 1) R.P. and L.P. are dependent children, and 2) Mother failed to act on her knowledge that R.P. was being abused.

■ ¶ 32 We next address Mother's assertion that the trial court erred in finding that aggravated circumstances exist. She concedes that while the evidence supports a finding of aggravated circumstances as to Father, it does not support that conclusion as to her. We reject Mother's claim.

¶ 33 The Juvenile Act, 42 Pa.C.S. §§ 6301–65, which was amended in 1998 to conform to the federal Adoption and Safe Families Act ("ASFA"), 42 U.S.C. § 671 *et seq.*, controls the adjudication and disposition of dependent children. *See In re C.B.*, 861 A.2d 287, 295 (Pa.Super.2004); *In re G.P.R.*, 851 A.2d 967, 975 (Pa.Super.2004). The policy underlying these statutes aims at the prevention of children languishing indefinitely in foster care, with its inherent lack of permanency, normalcy, and long-term parental commitment. *See In re C.B., supra; In re G.P.-R., supra.* Furthermore, the 1998 amendments to the Juvenile Act, as required by ASFA, place the focus of dependency proceedings on the child. Safety, permanency, and the well-being of the child must take precedence over all other considerations, including the rights of the parents. *In re C.B., supra.*

¶ 34 CYS alleged, and the trial court found, the existence of aggravated circumstances under 42 Pa.C.S. § 6302(2), thereby allowing it to suspend efforts at reunification. That section provides:

> **Aggravated circumstances.** Any of the following circumstances:
>
> . . . .
>
> (2) The child or another child of the parent has been the victim of physical abuse resulting in serious bodily injury, sexual violence or aggravated physical neglect by the parent.

¶ 35 As used in the statute, aggravated physical neglect means "[a]ny omission in the care of a child which results in a life-threatening condition or seriously impairs the child's functioning." *Id.* In cases of child abuse, a court's finding as to the identity of the abusers "need only be es-

tablished by *prima facie* evidence that the abuse normally would not have occurred except by reason of acts or **omissions** of the caretakers." *In the Interest of J.R.W., supra* at 1024 (emphasis added); *see also* 23 Pa.C.S. § 6381(d). Moreover, "The Juvenile Act must be applied together with the Child Protective Services Law in the resolution of child abuse complaints." Pennsylvania Family Practice and Procedure, Wilder, J., 17 PA Practice § 30:1 (footnote omitted) (citing *In the Interest of J.R.W., supra* ).

¶ 36 As noted, Mother admits that there were aggravated circumstances as to Father but argues that because she did not inflict, nor could she have prevented, R.P.'s bodily injuries, she is exempt from the consequences of that finding. Contending that clear and convincing evidence does not support a conclusion that aggravated physical neglect of R.P. was attributable to Mother, she reminds the court that she immediately took action and brought R.P. to the hospital upon discovering his injuries.

¶ 37 CYS counters that the trial court did not err in its decision. CYS points out:

Not only did R.P.'s fractured skull, subdural hematoma and retinal hemorrhaging put him in critical condition, creating a substantial risk of death, but his old injuries (at a minimum, a fractured wrist, severely bruised buttocks, and having been punched in the back, face, arms and torso as well) had to have impaired R.P.'s functioning.

CYS brief at 38.

¶ 38 While the trial court found that it was Father who inflicted R.P.'s August 26, 2007 injuries, it also underscored that it is impossible to determine which parent caused R.P.'s 100 bruises or his old healing wrist fracture. In determining the identity of abusers, the court must find "*prima facie* evidence that the abuse normally would not have occurred except by reason of acts or omissions of the parents." *In the Interest of J.R.W., supra* at 1024. Accordingly, even if Mother did not inflict a single bruise, the Battered Baby Syndrome suffered by R.P. would not have occurred but for Mother's omissions as his primary caretaker. Mother, on a daily basis, changed R.P.'s diapers, clothed him, and bathed him; he was jointly in her care and Father's care on August 23, 24, 25, and 26, 2007. Mother continued to observe bruises on R.P.'s body, especially after being in Father's care, yet she did nothing to protect the child.

¶ 39 In support of her right to relief, Mother relies upon *In re M.W., supra,* where the mother allowed unsupervised contact between the father and a younger child even after she knew the father sexually abused the older child. In that case, the court returned the children to the mother even though they were found to be dependent. Mother concludes that if the conduct in *M.W.* did not amount to aggravated physical neglect, then comparatively, neither would her own behavior.

¶ 40 The facts of *M.W.* are distinguishable from the case *sub judice.* Therein, the natural mother of six children knew that the eldest daughter had been abused by the children's biological father, but nevertheless permitted him to stay in the home. The trial court, after declaring all six children to be dependent, considered the emotional devastation involved with separating the children from each other. Since the father was incarcerated, the trial court ultimately allowed them to stay with their mother.

¶ 41 Conversely, since R.P. was in Parents' care and L.P.'s presence for mere weeks, we do not hesitate to conclude that a significant bond had not developed. Al-

though Father has since left the marital home, his risk to the children has not been eliminated; he is not, for instance, in prison as in *M.W.* As the *M.W.* Court determined that it was in the best interests of the six siblings to remain together in their own home, likewise here, the trial court had the obligation to place these children consistent with their best interest.

¶ 42 R.P. was the victim of physical abuse that resulted in a life-threatening condition and ultimately, limited physical functioning. Mother's professed lack of knowledge of this abuse and failure to act to protect R.P. highlights the circumstances that existed in this home. The trial court correctly determined that R.P. suffered child abuse and both L.P. and R.P. were subjected to aggravated physical neglect. Mother knew that R.P. continued to sustain unexplained bruises primarily following Father's caretaking, yet she failed to act on this knowledge. N.T., 10/4/07, at 107–08. "Because the trial judge is in the best position to observe the witnesses and evaluate their credibility, we accord great weight to his credibility determinations." *In re G.P.-R.*, 851 A.2d 967, 974 (Pa.Super.2004) (quoting *In re R.T.*, 778 A.2d 670, 677 (Pa.Super.2001)). As we stated in *In re C.B., supra* at 298:

> ASFA's purpose is to eliminate the need for family reunification efforts when it is established that children were exposed to sexual or physical abuse. These parents have exhibited no responsibilities attendant with parenting but have been abusive and grossly neglectful; thus, we direct our focus away from any parental "rights" and toward the protection of these innocent, scarred children, who have been subjected to egregious horrors that shake the very foundations of the precious family institution.

¶ 43 Finally, Mother's characterization of the finding of aggravated circumstances

as being applicable to Father but not to her reveals her lack of understanding regarding the courts' responsibility in interpreting the Juvenile Act. The court need not find the existence of aggravated circumstances as to a particular party; rather, it merely must determine whether they are present in the case. This is so, as noted *supra*, because the focus is not on the rights of the Parents; instead, the children's safety, permanence, and well-being take precedence. *In re C.B., supra.* We have no hesitation in affirming the trial court's finding of aggravated circumstances as to Mother.

¶ 44 Mother next asserts that the trial court erred in failing to analyze whether reasonable efforts to reunite Mother and the children should be made and at the very least, should have placed the children with relatives rather than in foster care. We disagree.

¶ 45 Children's health and safety are the guiding principles of federal and state child welfare legislation. As noted *supra*, ASFA amendments that were adopted by our General Assembly in the amendments to the Juvenile Act define situations where no attempts to reunite a dependent child with his family must be made. Therefore, where a court concludes that a parent has subjected a child to aggravated circumstances, as here, the Juvenile Act provides that "the court shall determine whether or not reasonable efforts to prevent or eliminate the need for removing the child from the home or to preserve and reunify the family shall be made or continue to be made . . . ." 42 Pa.C.S. § 6341(c.1).

¶ 46 Mother argues that since there was some evidence to demonstrate that she was an attentive mother, such as photographs of her playing with the children and testimony regarding her provision of speech therapy, the trial court should have concluded that CYS was required to make

reasonable efforts to preserve her family. She suggests the court did not conduct any analysis but rather, merely determined that given the aggravated circumstances, no reunification efforts were necessary.

¶ 47 In support, Mother cites several cases in which aggravated circumstances were found, but the children were placed with a parent. Mother claims that the trial court did not consider the issue of bonding between herself and the children, or bonding between the children, before deciding that reunification efforts would not take place.

¶ 48 We reject Mother's claim. First, the record establishes that Mother clearly was **not** an attentive parent; her child was the victim of repeated physical abuse and aggravated physical neglect, as found by the trial court and affirmed herein. Second, the trial court properly focused on the best interests of the children rather than rights of Mother. We emphasized in *In the Interest of Lilley*, 719 A.2d 327 (Pa.Super.1998), amendments to the Juvenile Act, based upon the ASFA, make clear that the health and safety of children supersede all other considerations. Third, despite Mother's stated concern and attachment to her children, which was the only evidence she presented concerning her bonding with the children, her failure to protect them precludes her continued care of them. As we stated in *In re A.H.*, 763 A.2d 873, 878 (Pa.Super.2000), "When the court finds aggravated circumstances exist, it is well within its discretion to order the cessation of reunification services." We noted in *A.H.* that abuse by a parent precludes "the necessity of reasonable reunification efforts." *Id.* That same conclusion is supported here.

¶ 49 In the case *sub judice*, the trial court based its decision on its evaluation of the totality of the circumstances, not solely on its determination that aggravated cir-

cumstances exist, as argued by Mother. Further,

> although the polestar of the Juvenile Act is reunification of the family, 55 Pa.Code § 3130.67 lists adoption as a permissible goal for a dependent child. *See id.* at (b)(9)(iii). *See also In the Matter of Luis R.*, 430 Pa.Super. 518, 635 A.2d 170 (1993), *appeal denied,* 538 Pa. 635, 647 A.2d 511 (1994) (noting permissible goals listed in 55 Pa.Code § 3130.67(b)(9), and explaining that "one goal is not mandated over another; nor does the language of the regulation require that each goal be implemented in the order in which they are listed.").

*In re R.T.*, 778 A.2d 670, 680 (Pa.Super.2001). The trial court, while noting that family preservation remains one of the primary purposes of the Juvenile Act, concluded that the children's safety and health, which are paramount considerations, cannot be assured in this familial setting. As we must accept the facts as found by the trial court that are supported in the record, *In re E.P., supra,* we reject Mother's contention. Accordingly, we conclude the court complied with statutory and precedential mandates in determining that reunification of this family need not occur and in doing so, did not abuse its discretion.

¶ 50 We also reject Mother's position that the trial court erred by failing to place the children with family members. Mother contends that adult relatives should have been given preference over non-relatives when determining L.P.'s placement. Her argument emphasizes the willingness and qualifications of four relatives who indicated a desire to provide care to the children. Once a child has been adjudicated dependent, "the issue of custody and continuation of foster care are determined according to a child's best interest." *In the Interest of Lilley, supra* at

331 (quoting *In the Interest of Sweeney,* 393 Pa.Super. 437, 574 A.2d 690, 691 (1990)).

¶ 51 Our review of the record compels our conclusion that the trial court complied with the "required preplacement findings" set forth in 42 Pa.C.S. § 6351(b). That section provides, in relevant part:

§ 6351. Disposition of dependent child

. . . .

(b) Required preplacement findings.— Prior to entering any order of disposition ... that would remove a dependent child from his home, the court shall enter findings on the record or in the order of court as follows:

(1) that continuation of the child in his home would be contrary to the welfare, safety, or health of the child;

(2) whether reasonable efforts were made prior to the placement of the child to prevent or eliminate the need for removal of the child from his home, if the child has remained in his home pending such disposition; or

(3) if preventive services were not offered due to the necessity for an emergency placement, whether such lack of services was reasonable under the circumstances; or

(4) if the court has previously determined ... that reasonable efforts were not made to prevent the initial removal of the child from his home, whether reasonable efforts are under way to make it possible for the child to return home.

**The court shall not enter findings under paragraph (2), (3) or (4) if ... aggravated circumstances exist** and no new or additional reasonable efforts to prevent or eliminate the need for removing the child from the home or to pre-

serve and reunify the family are required.

(emphasis added). Thus, since the existence of aggravated circumstances was determined, the court only was required to enter a finding in its order that "continuation of the child in his home would be contrary to the welfare, safety or health of the child." 42 Pa.C.S. § 6351(b)(1).

¶ 52 At the hearing on October 4, 2007, Stacy DeGroat, intake supervisor for CYS, testified that kinship care, utilized to support the continued relationship between children and their parents, was not being recommended in light of the aggravated circumstances present in the instant case. *See N.T.,* 10/4/07, at 324.

¶ 53 In addressing this issue, the trial court stated the following:

Placement with another relative such as the grandparents or uncle is inappropriate at this time. Maternal grandfather, S.H. is a widower and has a pacemaker. While this Court is encouraged by his enthusiasm, it must determine that placement with him would not be in the children's best interests. Furthermore, placement with Father's relatives would be inappropriate as well, given paternal uncle J.P.J.'s inexperience with caring for children, and [Grandparents'] proximity to Father's house. Additionally, this Court's Order of August 31, 2007, found removing L.P. from [Grandparents'] care was proper, given that they knew or should have known about Father's abuse of R.P.

Moreover, Children and Youth testified that kinship care cannot be utilized due to the goal not being reunification. "Due to the aggravated circumstances in this case, the agency cannot place these children at further risk of abuse. And therefore, kinship care could not be utilized at this point." Additionally, there

is no way to monitor future relationships with any relative.

Trial Court Opinion, 12/21/07, at 25 (citations to transcript omitted).

¶ 54 We cannot conclude that the trial court abused its discretion in placing the children[7] in foster care rather than with relatives. The trial court, after finding the existence of aggravated circumstances, exercised its discretion to make decisions regarding the children's best interests, directing its "focus away from any parental 'rights' and toward the protection of these innocent, scarred children...." *In re C.B.,* *supra* at 298. In light of Parents' ease of access to the children if placed with relatives, and due to the aggravated circumstances present, this Court, like the trial court, is loathe to risk the children's safety. Accordingly, we conclude the trial court did not err in placing L.P. and R.P. in foster care.

¶ 55 Next, Mother contends that the trial court erred in preventing counsel during cross-examination from reviewing notes used to refresh the recollection of medical experts. We conclude, however, that Mother has waived this claim. While she references three places in the notes of testimony where medical witnesses, Dr. Canter, Dr. Martakis, and Nurse Robbin, referred to notes while testifying, counsel failed to lodge any objection. N.T., 9/12/07, at 18, 70, and 100–01. Such failure to raise this issue before the trial court resulted in waiver. "It is axiomatic that, in order to preserve an issue for review, litigants must make **timely** and specific objections during trial...." *Allied*

*Electrical Supply Co. v. Roberts,* 797 A.2d 362, 364 (Pa.Super.2002) (emphasis in original). *See also Bednarek v. Velazquez,* 830 A.2d 1267 (Pa.Super.2003) (issue of whether court erred in failing to permit full *de novo* hearing not raised in the lower court and therefore waived); *Nagle v. Nagle,* 871 A.2d 832 (Pa.Super.2005) (failure to object at hearing to lack of witness testimony or to court's stated reasons for foregoing such testimony waived issue); Pa. R.A.P. 302(a) (issues not raised in lower court are waived and cannot be considered for first time on appeal).

¶ 56 We will not address Mother's claim that the trial court erred in allowing L.P.'s statements pursuant to the Tender Years Hearsay Act, 42 Pa.C.S. § 5985.1 ("Act"). In affirming the finding of dependency and aggravated circumstances herein, we did not rely upon L.P.'s statements to Lori Demark, the forensic interviewer, as described in testimony by Dr. Taroli.[8] Those statements are superfluous to the plethora of compelling evidence that exists in this case. Moreover, a close reading of the trial court's opinion reveals that while referencing it, the trial court did not rely on Dr. Taroli's testimony about Ms. Demark's interview of L.P. in concluding that the finding of dependency is supported by the evidence. Rather, the trial court found clear and convincing evidence based upon R.P.'s diagnosis with Shaken Baby Syndrome and Battered Baby Syndrome. *See* Trial Court Opinion, 12/21/07, at 16–20. Moreover, even if the trial court did rely on L.P.'s statements, the extensive medical

---

7. We note that at the time of entry of this dispositional order, R.P. remained hospitalized.

8. Dr. Taroli observed an interview between L.P and Ms. Demark. After open-ended questioning, L.P. announced that R.P.'s punishment is "a secret," and "Mommy said I can't

tell anybody." N.T., 9/12/07, at 153. L.P. later stated that "Daddy beats [R.P.] all the time," and R.P. "stands up and then falls down and his eyes are closed after he gets hit." *Id.* at 154. Through a demonstration with stuffed animals, L.P. "started pounding on the stuffed animal." *Id.*

evidence presented in this case suffices to support the findings of fact and conclusions of law. Thus, we will not address Mother's issue concerning the applicability of the Act.

¶ 57 Finally, we reject Mother's contention that Dr. Taroli's testimony is against the evidence and law. Initially, we note that Mother stipulated to Dr. Taroli's qualifications as an expert in the field of pediatric forensics, in which she was trained to identify injuries resulting from physical abuse. N.T., 9/12/07, at 132. The basis for Mother's claim, wherein she makes only one reference to the record, Reproduced Record at 171 (N.T., 9/12/07, at 156), is that Dr. Taroli's medical diagnosis of R.P. was erroneously based upon L.P.'s statements to Ms. Demark. Mother misrepresents the record. Dr. Taroli did not base her medical diagnosis of physical abuse on L.P.'s testimony. Instead, she relied upon the medical information concerning R.P.'s subdural hematoma, retinal hemorrhaging, and fractured skull, in addition to her review of the photographs of R.P.'s extensive bruises, noting that "even by just reviewing the photos alone without any other information, it is very obvious the child has been beaten severely." N.T., 9/12/07, at 157. Indeed, in rendering her diagnosis of "non-accidental head injury," Dr. Taroli made no reference to L.P.'s interview with Ms. Demark. *See id.* at 155–57. Accordingly, the trial court did not err in permitting the medical opinion of Dr. Taroli.

¶ 58 Order affirmed.