J-S29017-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: L.T., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.H., MOTHER | : | No. 682 MDA 2023 |

Appeal from the Order Entered April 6, 2023
In the Court of Common Pleas of York County
Juvenile Division at No(s):  CP-67-DP-0000108-2022

BEFORE:   MURRAY, J., KING, J., and COLINS, J.[*]

MEMORANDUM BY KING, J.:                    **FILED: OCTOBER 16, 2023**

Appellant, M.H. ("Mother"), appeals from the order entered in the York County Court of Common Pleas, which changed the permanency goal for L.T. ("Child") from reunification to adoption, following the motion of the York County Office of Children, Youth and Families ("CYF") for a combined placement review and dispositional review hearing.  We affirm.

The relevant facts and procedural history of this appeal are as follow. On March 17, 2022, six-week-old Child was admitted to the emergency room at Hershey Medical Center, where doctors discovered "a broken femur and rib fractures on both the right and left sides that were in various stages of healing."  (Dependency Petition, filed 5/17/22, at 2).  Mother and C.T. ("Father") reported that they were the only caregivers for Child since his birth,

_____

[*] Retired Senior Judge assigned to the Superior Court.

they denied dropping Child, and they could not explain how Child sustained the injuries. The responding caseworker noted, however, that Mother "was holding the child in an odd, non-comforting manner, *i.e.*, away from her body with both hands out in front of her." (***Id.*** at 3). CYF subsequently received a child protective services referral alleging physical abuse.

CYF filed an application for emergency protective custody on May 13, 2022, which the court granted that same day. On May 17, 2022, CYF filed a dependency petition. Later, CYF filed a motion for finding of aggravated circumstances, arguing that Child suffered physical abuse resulting in serious bodily injury. The court adjudicated Child dependent on June 1, 2022. On October 20, 2022, the court found clear and convincing evidence to establish that aggravated circumstances existed as to Mother and Father.

Thereafter, the court received a parenting capacity assessment of Mother from Dr. Robert Gordon, M.Ed., a licensed psychologist.[1] Dr. Gordon expressed concerns over Mother's difficulties with "setting and enforcing boundaries in her relationship with [Father]." (CYF Exhibit 1, submitted 11/30/22, at 15). Dr. Gordon also stated that "the caseworker strongly suspects that [Father] had engaged in domestic violence toward [Mother], yet [Mother] remained in the relationship." (***Id.***) Dr. Gordon observed: "If the child's father caused the injuries to the child, as suspected, there are some

---

[1] Dr. Gordon conducted this assessment on September 8, 2022, and the court received the report at a status review hearing on November 30, 2022.

concerns that [Mother] was not able to protect the child and not able to ensure his safety." (*Id.* at 14). Dr. Gordon concluded that Mother's "weaknesses in her parenting skills are in her ability to provide guidance and boundaries and in her ability to ensure the safety of the child." (*Id.* at 16).

On March 9, 2023, Dr. Lisa Jannetta, Psy.D., a licensed psychologist, conducted a protective capacity assessment of Mother. Based upon this assessment, Dr. Jannetta expressed concerns with Mother's "history of protecting her son and taking action when there were threats to his safety." (CYF Exhibit 2, submitted 4/6/23, at 12). Dr. Jannetta also opined that Mother may not "comprehend the physical harm to her child and the dangers to his safety in her home." (*Id.* at 13). Dr. Jannetta concluded that it is "questionable whether [Mother] is capable of effectively protecting [Child] without supervision." (*Id.* at 14).[2]

---

[2] The trial court provided the following analysis of Dr. Jannetta's conclusions:

> The evaluator found that some of Mother's decisions appeared to have been based upon her own needs, related to her own complicated childhood, [rather] than the needs of [Child]. … [Dr. Jannetta] found that Mother does not seem to comprehend what secure and healthy relationships are or to have a strong sense of self, which affects [Mother's] comprehension of what is required of her as a protector of [Child]. [Dr. Jannetta] was encouraged by Mother's Family Advocate David Kasberg's representations of an improved bond between Mother and [Child]; however, [Dr. Jannetta] noted how troubling Mother's prior inability to act on [Child]'s behalf was. Though Mother was able to recognize by the time of her evaluation, that Father "did

*(Footnote Continued Next Page)*

On April 4, 2023, CYF filed a motion for a combined placement review and dispositional review hearing. The court conducted the hearing on April 6, 2023, and it summarized the witnesses' testimony as follows:

> Brittany Sunday testified that she is the family therapist working with Mother and Father in this case. The current goals for Mother were "stabilization of mental health, increasing healthy coping skills for stress management with a focus on anxiety, improving self-esteem and productive communication skills." Mother's progress towards stabilizing her mental health was rated as moderate. The psychiatrist Mother saw diagnosed her with social anxiety disorder and adjustment disorder with mixed emotion disturbance. The psychiatrist recommended that Mother continue working with Catholic Charities, including her therapist through them, Leanne Meyers, and the psychiatrist prescribed Mother medication. The medication Mother was prescribed was fifty milligrams of Zoloft, which the psychiatrist, Dr. Heinly, hoped would help Mother feel less socially uncomfortable, which would enable her to "be more appropriately assertive and confident in her presentation and manner." Mother's progress towards her other goals was also rated, by Ms. Sunday, as moderate.
>
> Ms. Sunday described Mother as fidgeting a lot and having social anxiety, which Ms. Sunday was working to teach her coping skills for. Regarding Mother's medication, Ms.

---

> something" to [Child], [Dr. Jannetta] noted that it was unknown how Mother, who is overly dependent on others, would act in an unsupervised situation. At the time of preparation of the report, Mother had demonstrated an "improved capacity for protectiveness with supervision." Considering the necessity of certainty in [Child's] young life, [the trial court] found it compelling that the evaluator wrote "if [Mother] continues to improve on her trajectory, she may **eventually** be able to function independently regarding protective capacity."

(Trial Court Opinion, filed 6/6/23, at 14-15) (internal footnotes and record citations omitted) (emphasis in original).

- 4 -

Sunday testified that, in her opinion, Mother had not been taking it long enough, at the time of the hearing, for Ms. Sunday to notice any effect. Regarding visitation progress, Ms. Sunday testified that the next step would be partially supervised visits and that, at that point, Ms. Sunday had no concerns about moving forward with partial visitation[;] however and importantly, Ms. Sunday admitted that she had not reviewed [the] protective capacity assessment on Mother, dated March 9, 2023, and therefore accepted [the trial court's] decree that there would be no progression towards partially supervised visitation. Ms. Sunday acknowledged that Mother was approved to have contact with [Child] in the kinship home, supervised by the kinship parents, for approximately three hours on weekends.

\* \* \*

David Kasberg testified that he is a family advocate with Catholic Charities and that he had been working with Mother and Father. Mr. Kasberg supervised Mother's visitation once per week and Ms. Sunday covered the other weekly visitations. These visitations occurred at Mother's residence and were fully supervised. Mr. Kasberg felt that Mother was fully prepared and generally parented from a nurturing and appropriate standpoint. Although Mr. Kasberg rated Mother's progress as moderate[,] he thereafter testified that "I can't say mom has done very well with our agency's services, so I can't speak to that."

\* \* \*

Sarah White testified that she had written a report to the court and that there were no updates in the interim. Ms. White testified that [CYF] recommended that [Child] be placed in the custody of [a maternal cousin], and that legal custody be retained through [CYF]. Ms. White testified that the [maternal cousin] only lived about ten to fifteen minutes from the then current resource family; though the [maternal cousin lives] across the state line in Maryland. [CYF] continued to recommend that the goal be changed to adoption due to the updated protective capacity assessment that was completed by Dr. Janetta.

(Trial Court Opinion at 3-6) (internal record citations omitted). At the

conclusion of the hearing, the court changed Child's permanency goal from reunification to adoption. On Monday, May 8, 2023, Mother timely filed notice of appeal and a concise statement of errors.

Mother now raises two issues for our review:

Did the [trial] court abuse its discretion and [err] as a matter of law when it unreasonably changed the goal from reunification to adoption despite consistent positive progress by Mother.

Did the [trial] court abuse its discretion and [err] as a matter of law when it changed the goal to adoption from reunification when in less than twelve (12) months Mother made moderate progress in [alleviating] the circumstances which necessitated the original placement, and it was contrary to the best interest of the child.

(Mother's Brief at 4).

Mother's issues are related, and we address them together. Mother argues that she has demonstrated moderate progress in alleviating the circumstances that necessitated the original placement, and she continues her attempts to achieve all goals outlined in her family service plan. Mother emphasizes that she has implemented the recommendations provided by the parenting and protective capacity assessments. Mother complains that the parenting capacity assessment did not indicate that she lacks the protective capacity to ever take care of Child. Mother insists that she meets all of Child's needs during visits, and she has a very strong bond with Child. Under these circumstances, Mother concludes that the court's decision "to change the goal from reunification to adoption is not in the best interest of [Child]," and the

court's decision "is not supported by competent evidence." (*Id.* at 20-21).

We disagree.

On appeal, goal change decisions are subject to an abuse of discretion standard of review. *In re N.C.*, 909 A.2d 818, 822 (Pa.Super. 2006).

> In order to conclude that the trial court abused its discretion, we must determine that the court's judgment was manifestly unreasonable, that the court did not apply the law, or that the court's action was a result of partiality, prejudice, bias or ill will, as shown by the record. We are bound by the trial court's findings of fact that have support in the record. The trial court, not the appellate court, is charged with the responsibilities of evaluating credibility of the witness and resolving any conflicts in the testimony. In carrying out these responsibilities, the trial court is free to believe all, part, or none of the evidence. When the trial court's findings are supported by competent evidence of record, we will affirm, even if the record could also support an opposite result.

*Id.* at 822-23 (internal citations and quotation marks omitted).

The Juvenile Act controls the disposition of dependent children. *In re R.P.*, 957 A.2d 1205, 1217 (Pa.Super. 2008). Section 6351 provides in relevant part:

> **§ 6351. Disposition of dependent child**
>
> \*　　\*　　\*
>
> **(f)　　Matters to be determined at permanency hearing.**—At each permanency hearing, a court shall determine all of the following:
>
> > (1)　The continuing necessity for and appropriateness of the placement.
> >
> > (2)　The appropriateness, feasibility and extent of compliance with the permanency plan developed for the

- 7 -

child.

(3)     The extent of progress made toward alleviating the circumstances which necessitated the original placement.

(4)     The appropriateness and feasibility of the current placement goal for the child.

(5)     The likely date by which the placement goal for the child might be achieved.

(5.1)   Whether reasonable efforts were made to finalize the permanency plan in effect.

(6)     Whether the child is safe.

*     *     *

(9)     If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:

(i)     the child is being cared for by a relative best suited to the physical, mental and moral welfare of the child;

(ii)    the county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child; or

(iii)   the child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or custodian within the time frames set forth in the permanency plan.

\*　　\*　　\*

**(f.1)  Additional determination.**—Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:

(1)  If and when the child will be returned to the child's parent, guardian or custodian in cases where the return of the child is best suited to the safety, protection and physical, mental and moral welfare of the child.

(2)  If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(3)  If and when the child will be placed with a legal custodian in cases where the return to the child's parent, guardian or custodian or being placed for adoption is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(4)  If and when the child will be placed with a fit and willing relative in cases where return to the child's parent, guardian or custodian, being placed for adoption or being placed with a legal custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

\*　　\*　　\*

42 Pa.C.S.A. § 6351(f), (f.1).

"When the child welfare agency has made reasonable efforts to return a [dependent] child to his or her biological parent, but those efforts have failed, then the agency must redirect its efforts towards placing the child in an adoptive home." ***In re N.C., supra*** at 823.

> [T]he fifteen-to-twenty-two-month timeframe set forth in the Juvenile Act is not prerequisite to a goal change, but rather is "an aspirational target in which to attain permanency." *In the Interest of L.T.*, 158 A.3d 1266, 1279 (Pa. Super. 2017) (citing 42 Pa.C.S.A. § 6351(f.1)(9)). While trial courts should not rush to change a child's permanency goal to adoption in circumstances where a parent is making progress toward reunification, neither should courts persist in attempting to reunite a family when further reunification efforts would be futile and/or contrary to a child's best interest.

*In re J.D.H.*, 171 A.3d 903, 909 (Pa.Super. 2017).

> Although the agency has the burden to show a goal change would serve the child's best interests, "[s]afety, permanency, and well-being of the child must take precedence over **all** other considerations" under Section 6351. *In re D.P.*, 972 A.2d 1221, 1227 (Pa.Super. 2009), *appeal denied*, 601 Pa. 702, 973 A.2d 1007 (2009) (emphasis in original); *In re S.B.*, … 943 A.2d 973, 978 [(Pa.Super. 2008)], *appeal denied*, 598 Pa. 782, 959 A.2d 320 (2008). "[T]he parent's rights are secondary" in a goal change proceeding. *In re D.P., supra*.
>
> Because the focus is on the child's best interests, a goal change to adoption might be appropriate, even when a parent substantially complies with a reunification plan. *In re N.C., supra* at 826-27. Where a parent's "skills, including her judgment with regard to the emotional well-being of her children, remain problematic[,]" a goal change to adoption might be appropriate, regardless of the parent's compliance with a permanency plan. *Id.* at 825. The agency is not required to offer services indefinitely, where a parent is unable to properly apply the instruction provided. … Thus, even where the parent makes earnest efforts, the "court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa.Super. 2006).

*In re R.M.G.*, 997 A.2d 339, 347 (Pa.Super. 2010), *appeal denied*, 608 Pa.

648, 12 A.3d 372 (2010) (emphasis in original).

Instantly, the trial court found that a goal change to adoption is appropriate:

> We do not deny that Ms. Sunday and Mr. Kasberg testified that the parents had made "moderate progress." However, … even substantial progress, which is not present here, does not necessarily dictate reunification. The plain fact of the matter was that Mother's protective capacity assessment established that it was unknown whether Mother could appropriately protect [Child] absent supervision. The evaluator left it to the involved agencies and case manager to determine at what point Mother might demonstrate effective protective capacity and could parent absent supervision and support. The involved agency recommended the change of goal. Mother's history of a lack of protective capacity in regard to both herself and to [Child], her shifting stories as to the cause of [Child's] injuries, her late recognition of Father's role in [Child's] injuries, her delayed willingness to terminate her relationship with Father, and the evaluator's repeated expressions of concern despite at least one report of progress, as far as the parent-child bond, [were] all concerning. … Mother might **eventually** be able to parent [Child] unsupervised and without support, but [Child] needs stability as soon as possible and the change of goal allows for that.

> *    *    *

> Additionally, Mother's moderate progress under supervision has not obviated Mother's clear susceptibility to mental health issues, which, unfortunately, are a shorthand for Mother's inability to prioritize [Child's] needs above her own—especially as it regards [Child's] physical safety. The evaluator noted the progress reported on the parent-child bond; however, the evaluator expressed enough concern about Mother's ability to prioritize [Child] that [the trial court] felt compelled to provide [Child] permanency by way of a change of goals. Reunification efforts would be futile when Mother's demonstrated inability to stand up for and protect [Child], absent supervision, is unlikely to resolve within an acceptable window of time. The best interests of [Child] are served by providing him permanency. Further,

- 11 -

it was clear to the [trial court] that Mother faces a long, long road ahead in learning how to protect herself and stand on her own two feet, let alone protecting [Child].

(Trial Court Opinion at 17-18, 20) (internal record citations omitted) (emphasis in original).

Our review of the record confirms that sufficient evidence supported the court's findings. *See In re N.C., supra*. The court considered Mother's moderate progress in alleviating the circumstances that necessitated Child's placement. Nevertheless, the court also weighed the testimony and various expert reports, including Dr. Jannetta's protective capacity report that questioned whether Mother would ever be able to protect and parent Child. Based upon this evidence, the court determined that prioritizing permanency in Child's life best served his interests. *See In re J.D.H., supra*; *In re R.M.G., supra*. We cannot say that the court abused its discretion in this regard. *See In re R.M.G., supra*; *In re N.C., supra*. Accordingly, we affirm.

Order affirmed.

Judgment Entered.

_____
Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/16/2023

- 12 -