J-A23014-14

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.L., A MINOR CHILD | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.L. | | No. 249 WDA 2014 |

Appeal from the Order January 14, 2014,
Court of Common Pleas, Washington County,
Criminal Division at No. CP-63-DP-0000021-2012

BEFORE:  DONOHUE, ALLEN and MUSMANNO, JJ.

MEMORANDUM BY DONOHUE, J.:  **FILED OCTOBER 03, 2014**

Amber L. ("Mother") appeals from the order entered by the Washington County Court of Common Pleas (the "juvenile court") on January 14, 2014, removing A.L., born in May 2008, from Mother's home and placing her in relative foster care.  For the reasons that follow, we affirm.

A summary of the facts and procedural history follows.  Mother and Aaron L., A.L.'s father ("Father"), were married in 2005.  While Mother was pregnant with A.L., Father was sent to serve in Iraq with the United States Marine Corp.  N.T., 1/14/14, at 431.  A.L. was born approximately five months before Father returned from duty.  *Id*. at 432.  Due to difficulties in adjusting to Father's return from military service, Mother and Father separated in February 2011, at which time Mother and Father agreed to a joint custody arrangement of A.L.

After a few months passed, Mother began to make reports to Washington County Children and Youth Social Services ("CYS") that Father

physically, mentally, and sexually abused A.L. The first report of physical abuse was made by Mother on May 20, 2011. On June 3, 2011, Mother filed for and obtained a temporary protection from abuse order ("PFA") against Father. The PFA ordered all contact between Father and A.L. to be supervised.

Mother reported that Father again physically abused A.L. on July 6, 2011 and psychologically abused the child on August 12, 2011. In December 2011, the PFA court terminated all contact between Father and A.L. and ordered a forensic interview following new allegations by Mother that Father sexually abused A.L. After all reports were deemed unfounded,[1] however, the PFA court dismissed the PFA on January 31, 2012, and reinstated the original custody agreement between Mother and Father.

On February 6, 2012, CYS presented an emergency shelter petition to the juvenile court, requesting an order of no contact between Father and A.L. and that A.L. participate in sexual assault victim counseling. The juvenile court granted the petition. On March 13, 2012, CYS filed a dependency petition ("the Petition"). Because of multiple continuances, a merit hearing on the Petition was not held until January 28, 2013. During that time, Mother made three additional reports of sexual abuse on March 16, 2012, March 29, 2012, and April 12, 2012. According to the allegations,

---

[1] An unfounded report is defined as: "Any report made pursuant to this chapter unless the report is a 'founded report' or an 'indicated report.' 23 Pa.C.S.A. § 6303(a).

on March 29, 2012, Father put his penis by A.L.'s mouth and made her suck on her fingers while his penis touched her mouth. On April 12, 2012, Father used scissors to make A.L.'s vagina and rectum bleed. A.L. never received a medical examination following this disclosure.

At the dependency hearing on January 28, 2013, the juvenile court adjudicated A.L. dependent and ordered that A.L. remain in Mother's home. The juvenile court also ordered Mother and Father to participate in psychological and interactional evaluations with A.L., to be performed by Dr. Neil Rosenblum ("Dr. Rosenblum"), Mother and Father to participate in a sexual boundary assessment, and continued the existing no contact order between Father and A.L. pending the evaluation by Dr. Rosenblum.

The juvenile court conducted a review hearing on April 15, 2013. At the hearing, CYS, Mother, Father, and the guardian *ad litem* stipulated to accept the recommendations provided by Dr. Rosenblum in his evaluation report. Dr. Rosenblum's report was given to the juvenile court. The court ordered continued dependency, Father and A.L. to participate in reunification therapy sessions followed by supervised visits, A.L.'s trauma therapy with Dr. Ventura to discontinue, and prohibiting Mother and Father from speaking negatively about the other parent in the presence of A.L.

In June 2013, Father and A.L. began meeting for a weekly visit at Mingo Park. At the review hearing held on September 24, 2013, CYS recommended that the weekly visits occur at Father's home. The juvenile

court granted the request, permitting Father and a case aide to pick A.L. up from school on Tuesdays and take her to Father's house for their visit.

Reports by CYS indicated that although A.L. had fun at Father's house, A.L. made several statements indicating that Mother did not want her to enjoy the visits. At one visit, A.L. got sidewalk chalk on her clothes. A.L. became extremely upset and stated "Oh, no, now they are going to know I played with dad." N.T., 9/24/13, at 45. On another occasion, when Father told A.L. it was time to clean up and meet Mother, A.L. began crying and shaking saying that she was going to be in trouble for being at Father's house and eating food from him that was not bought from a restaurant. At yet another visit, A.L. stated that she did not want Mother to know she played in the snow.

On October 15, 2013, Mother called Officer Fendya of the Carroll Township Police Department to report that A.L. told her on the way home from a visit with Father that Father put his hands down her pants and hurt her. Mother also reported that A.L. told her that the CYS case aide saw Father put his hands down A.L.'s pants and simply told him to stop and not to do that again. Officer Fendya's report stated that Mother was hysterical as she informed him of the allegations. A ChildLine report was made and CYS was notified of the allegations. The CYS case aide denied that any physical contact between Father and A.L. occurred, let alone inappropriate or sexual contact.

A forensic interview with A.L. occurred on November 7, 2013. A.L. did not disclose anything about the incident on October 15, 2013, but claimed that Father put his fingers in her vagina and made her suck his penis when she was two years old. When questioned, A.L. could not describe a penis.

On January 14, 2014, the juvenile court held a permanency review hearing. At the conclusion of the hearing, the court made a ruling from the bench and issued an order. The juvenile court found Mother to be a perpetrator of emotional and psychological abuse by clear and convincing evidence. Order of Court, 1/14/14. The juvenile court also found that A.L. continued to be dependent, removed her from Mother's home, and placed her in relative foster care. *Id.* The juvenile court ordered A.L. to undergo psychiatric and psychological evaluations, ordered Mother and Father to continue with independent counseling, and ordered that Mother and Father partake in separate, supervised, non-overnight visitation with A.L. *Id.* A review hearing was scheduled to take place in 60 days. *Id.*

On February 12, 2014, Mother filed a timely notice of appeal.[2] On appeal, Mother raises the following issues for our review:

_____

[2] We note that this case was delayed for panel listing as a result of a transcript delay. The certified record was due to this Court by March 14, 2014. On March 27, 2014, the chambers of the Honorable Katherine Emery of the Washington County Court of Common Pleas informed this Court that there was a delay with the transcripts. Her Honor indicated that the court reporter had completed only 75 of approximately 550 pages of transcripts. A delinquent record notice was issued by this Court's Prothonotary on April 15, 2014. This Court did not receive the certified record until April 29, 2014. On May 19, 2014, Mother requested an extension of time to file her

1.  Whether the Juvenile Court erred as a matter of law and abused its discretion in finding that there was clear and convincing evidence that [A.L.] is the victim of emotional and psychological abuse being perpetrated by Mother, *inter alia*, in light of the testimony and opinions by Elizabeth Ventura, Ph.D. and [A.L.]'s disclosures of abuse and behaviors?

2.  Whether the Juvenile Court erred as a matter of law and abused its discretion in finding that it was in the best interest of [A.L.] to remove [A.L.] from Mother's home?

3.  Whether the Juvenile Court erred as a matter of law and abused its discretion in finding that [CYS] used reasonable efforts to prevent the necessity of placement outside of [A.L.]'s home?

4.  Whether the Juvenile Court erred as a matter of law and abused its discretion in admitting and placing any weight on Dr. Rosenblum's report when Dr. Rosenblum was not available to testify and subject to cross-examination?

Mother's Brief at 4.

For her first issue on appeal, Mother challenges the juvenile court's finding that she is a perpetrator of child abuse. Our standard of review of a juvenile court's decision in a dependency action is as follows:

> [T]he standard this Court employs is broad. We accept the [juvenile] court's factual findings that are supported by the record, and defer to the court's credibility determinations. We accord great weight to this function of the hearing judge because [s]he is in the position to observe and rule upon the credibility of the witnesses and the parties who appear before [her]. Relying upon [her] unique

appellate brief. This Court granted the request, requiring Mother's brief to be filed on or before June 2, 2014. Mother complied and all appellees timely filed their responsive briefs.

posture, we will not overrule [the juvenile court's findings] if they are supported by competent evidence.

*In re R.P.*, 957 A.2d 1205, 1211 (Pa. Super. 2008) (internal citations omitted).

Determinations of child abuse are governed by 23 Pa.C.S.A. § 6303(b). Section 6303(b)(1)(ii) provides that child abuse shall mean "an act or failure to act by a perpetrator which causes nonaccidental serious mental injury to or sexual abuse or sexual exploitation of a child under 18 years of age." 23 Pa.C.S.A. § 6303(b)(1)(ii). Serious mental injury is defined as:

> A psychological condition, as diagnosed by a physician or licensed psychologist, including the refusal of appropriate treatment, that:
>
> > (1) renders a child chronically and severely anxious, agitated, depressed, socially withdrawn, psychotic or in reasonable fear that the child's life or safety is threatened; or
> >
> > (2) seriously interferes with a child's ability to accomplish age-appropriate developmental and social tasks.

23 Pa.C.S.A. § 6303(a).

In this case, the juvenile court found, "by clear and convincing evidence, that there is emotional and psychological abuse being perpetrated by [M]other at this time." Juvenile Court Order, 1/17/14, at 1-2. In support of its determination, the juvenile court made the following findings of fact. First, the juvenile court "concluded that the Father never sexually mistreated [A.L.]." Juvenile Court Opinion, 4/23/14, at 7. The juvenile court found

- 7 -

A.L.'s behavior during the visits with Father to be "most revealing." **Id.** "When [A.L.] had fun with [] Father, she asked the caseworker not to tell her Mother. [A.L.] states she should not eat food during the visit unless it is from a restaurant. [A.L.]'s behavior changes dramatically leaving the visits. [A.L.] experienced extreme behaviors before court hearings." **Id.** In addition, the juvenile court found:

> [A.L.] can throw a tantrum at a moment's notice and then stop. [A.L.] has referred to the Father as a pedophile. [A.L.]'s allegations against the Father appeared to be canned and prepared. While she stated she was forced to lick her Father's penis, [A.L.] was unable to describe a penis or provide any detail. [A.L.] made repeated allegations and was able to tell multiple people, but she always used the same words in the same order. This is evidence that [A.L.] was coached.

**Id.** at 9.

The juvenile court "concluded that Mother has manipulated [A.L.] to such an extreme that she will say and do almost anything" and "that Mother has told [A.L.] that the Father has done these bad things to her." **Id.** at 9. As a result, the juvenile court concluded that the evidence of record "leads to a logical conclusion that the Mother is victimizing [A.L.] into falsely believing that her Father is an evil person. This constitute[s] emotional and psychological abuse." Juvenile Court Opinion, 4/23/14, at 11.

Mother, challenging the weight of the evidence presented at the permanency review hearing, asserts that the juvenile court's finding was made in error "in light of the testimony and opinions by Elizabeth Ventura,

Ph.D. ("Dr. Ventura") and [A.L.]'s disclosures of abuse and behaviors." Mother's Brief at 14. At the permanency review hearing, Dr. Ventura, a licensed professional counselor, testified that A.L. began counseling with her in October 2012. N.T., 1/14/14, at 509. Dr. Ventura testified that she diagnosed A.L. with post-traumatic stress disorder ("PTSD"). **Id.** at 514. According to Dr. Ventura, "In working with [A.L.], very early on she was – it was clear she had demonstrated some significant PTSD symptoms." **Id.** These symptoms "were spontaneous and by all accounts, by [Dr. Ventura's] professional opinion, not something that was rehearsed or coached." **Id.** at 564. Dr. Ventura further explained that "[t]here were spontaneous interventions that [she] put in place in therapy that elicited responses from [A.L.] that nobody would have been able to know about." **Id.**

The juvenile court states that it did not find Dr. Ventura's testimony to be believable or credible regarding her conclusion that A.L. had not been coached because, according to the court, Dr. Ventura "never considered the possibility that Father did not abuse [A.L.]" and because "Dr. Ventura accepted as true all that Mother reported." Juvenile Court Opinion, 4/23/14, at 11-12. Nevertheless, the juvenile court states that it "considered Dr. Ventura's testimony as well as all of the other testimony and evidence in the case in making [its] decision." **Id.** at 12.

As previously stated, we are bound by the juvenile court's credibility determinations. **In re R.P.**, 957 A.2d at 1211. The court's finding in this

regard is supported by the record, as it reflects that Dr. Ventura never spoke with Father or the CYS caseworker, nor was she aware that the forensic evaluator found that A.L. had been coached. N.T., 1/14/14, at 531-32, 555. Indeed, when asked, Dr. Ventura indicated that an allegation that A.L. had been coached would give her "pause" and cause her to "look more closely at the disclosures[,]" *id.* at 556, and that it was possible A.L. was disclosing that Father abused her when in fact he had not. *Id.* at 556-57.

Furthermore, our review of the record, including the testimony provided by Dr. Ventura, supports the juvenile court's finding that Mother was a perpetrator of abuse. The evidence establishes that A.L. is "chronically and severely anxious, agitated […] or in reasonable fear that [her] life or safety is threatened." 23 Pa.C.S.A. § 6303(a). Numerous witnesses testified with regard to A.L.'s chronic and severe anxiety. Dr. Ventura testified that A.L. "was always very much fixated on her safety." N.T., 1/14/14, at 517. Dr. Ventura testified that on one occasion, during therapy, A.L. suddenly had a panic attack. *Id.* at 516. A.L. became extremely panicked, began crying and breathing heavily, crawled in a fetal position, said she was scared, and hid behind [the] couch." *Id.* According to Dr. Ventura, A.L. "had a very sensitive startle response," which caused her to become on guard at any noise. *Id.* at 517. In addition, A.L. was often in a state of hyper vigilance, such as refusing to sit by the door. *Id.* at 517.

CYS case aides testified that A.L. "seems like she's conflicted when she plays with her father, like should she play with him, should she not. There is definite turmoil within her." N.T., 9/24/13, at 13. As previously discussed, A.L. often demonstrated that she was fearful that she would be in trouble for being at Father's house, playing with Father, and eating food at Father's house. A.L.'s entire demeanor would change when it was time for her to leave Father's house and return to Mother. N.T., 1/10/14, at 45. The record reflects that A.L. would smile and laugh as she interacted with Father, but when she was asked if she had fun, her answer was always "no." *Id.* at 56.

In addition, the evidence establishes that A.L.'s ability to accomplish age-appropriate developmental and social tasks has been disrupted. A.L. demonstrates regressive behaviors such as wetting the bed. N.T., 9/24/13, at 67, 70. Moreover, A.L. converses about subject matter that normal five and six year olds do not typically engage. A.L. has stated that "she has had to speak with all these doctors […] so her dad could go to jail." N.T., 1/10/14, at 67. Matthew Tutee, the reunification counselor, testified that it was unlikely for a five year old to independently come up with that statement. *Id.* at 263. According to Christina Tatar, "[A.L] was [also] able to articulate in words what progress was going to occur on the case." N.T., 9/24/13, at 26-27.

Thus, the evidence of record supports the juvenile court's determination that A.L. suffers from serious mental injury that renders her

"chronically and severely anxious, agitated, depressed, socially withdrawn, psychotic or in reasonable fear that [her] life or safety is threatened" and also that the abuse has interfered with her ability "to accomplish age-appropriate developmental and social tasks." 23 Pa.C.S.A. § 6303(a)(1), (2).

The evidence further supports a finding that Mother is the perpetrator of this abuse. Mother asserts that there was not clear and convincing evidence that she is the perpetrator of the abuse because

> [t]he [j]uvenile [c]ourt stated that it does not know why [A.L.] is making these statements, whether Mother or maternal grandmother prompt [A.L.] to lie or whether this is [A.L.] making these statements on her own and is doing this to please Mother or was taught to believe this happened.

Mother's Brief at 14. Mother further argues that despite concerns that another person may have influenced A.L., there was no testimony identifying Mother as the person influencing her. *Id.* at 21.

In cases such as this, where there is no direct evidence to identify the perpetrator of abuse, but the child was in a particular caretaker's care when the abuse occurred,[3] this Court has relied upon the evidentiary presumption in 23 Pa.C.S.A. § 6381, which provides:

---

[3] Mother cites to this Court's recent *en banc* decision in ***In the Matter of L.Z.***, 91 A.3d 208 (Pa. Super. 2014) (*en banc*), *appeal granted*, 96 A.3d 989 (Pa. July 17, 2014), in support of her argument that she was not a perpetrator of abuse against A.L. We find this case to be distinguishable from the instant matter because in ***L.Z.***, the single act of physical abuse occurred at a time that the child was not in the mother's care. ***Id.*** at 217-

- 12 -

> **(d) Prima facie evidence of abuse.**—Evidence that a child has suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child shall be prima facie evidence of child abuse by the parent or other person responsible for the welfare of the child.

23 Pa.C.S.A. § 6381(d).

Thus, once a court determines by clear and convincing evidence that a child was abused while the child was in a particular caregiver's care, "its finding as to the abusers need only be established by *prima facie* evidence that the abuse normally would not have occurred except by reason of acts or omissions of the caretakers." ***Interest of J.R.W.***, 631 A.2d 1019, 1023-24 (Pa. Super. 1993); 23 Pa.C.S.A. § 6381(d). The language of § 6381(d) "simultaneously encompass[es] both the singular and plural [such that] proof of the nature of the child's harm, alone, is prima facie evidence of child abuse **by anyone and/or all who are found to be 'responsible for the welfare of the child' during the time of the alleged injuries**." ***In re J.G.***, 984 A.2d 541, 547 (Pa. Super. 2009) (emphasis added) (citation omitted).

In ***J.R.W.***, the trial court adjudicated J.R.W. dependent and found that the child was the victim of abuse. J.R.W. had multiple rib fractures, swelling

---

18. In the case presently before this Court, the record establishes that A.L. resided with Mother at the time of the ongoing abuse and that Mother was A.L.'s primary caretaker. N.T., 9/24/13, at 11, 188. Accordingly, ***In the Matter of L.Z.*** is inapposite to the case herein.

- 13 -

and hemorrhaging in the left side of her brain, blood inside of her central nervous system, seizures, and required ventilator support. *Id.* at 1020-21. "[M]edical evidence established that J.R.W.'s injuries were consistent with child abuse and that she could be classified as a 'shaken baby.'" *Id.* at 1021. "[A]lthough the trial court was unable to determine whether one or both of J[.]R[.]W[.]'s parents were the perpetrators of the abuse, it found that the life-threatening injuries were sustained while in her parents' care." *Id.* at 1021.

On appeal, J.R.W.'s parents contested the trial court's finding that they were the perpetrators of abuse because "there was not clear and convincing evidence that one or the other of the parents caused the serious injuries to the child." *Id.* This Court affirmed the trial court's holding, stating:

> The Legislature has determined that the likelihood clearly established abuse has occurred, other than at the hands of the custodian, is so small that *prima facie* evidence the custodian has caused the injury, either by acts or omissions, is all that is required. We find no defect in this reasoning. Such a standard provides maximum protection for the child victim […]. It is not equivalent to a finding of guilt in a criminal proceeding which could result in deprivation of freedom. Thus[,] the legislature has balanced the needs of society and children for protection against the abuser's possible patterned behavior and his/her right to freedom unless found guilty beyond a reasonable doubt.

*Id.* at 1024. We then concluded that in light of the clear and convincing evidence of abuse against J.R.W. and the unquestioned *prima facie* evidence establishing the parents as the primary custodians during the time of the

abuse, "[t]he trial court did not err in making the finding of child abuse and naming the parents as the abusers." *Id.* at 1025.

In the instant matter, the juvenile court, much like the court in *J.R.W.*, could not determine who perpetrated the abuse against A.L. However, the evidence presented at trial established that A.L. was abused, that A.L. resided with Mother at the time the ongoing abuse occurred, and that Mother was A.L.'s primary caretaker. N.T., 9/24/13, at 11, 188. Accordingly, we conclude that the juvenile court did not err in finding that Mother was the perpetrator of abuse against A.L..

For her second and third issues on appeal, Mother argues that the juvenile court erred and abused its discretion in finding that it was in A.L.'s best interest to remove A.L. from Mother's home and that CYS used reasonable efforts to prevent the necessity of placement outside of the child's home. Mother's Brief at 21-25. Because these issues are related, we review them together.

Under the Juvenile Act, once a court adjudicates a child dependent, the trial court must enter an order of disposition determining custody of the child. The juvenile court may order any of the following:

> (1) Permit the child to remain with his parents, guardian, or other custodian, subject to conditions and limitations as the court prescribes, including supervision as directed by the court for the protection of the child.

> (2) Subject to conditions and limitations as the court prescribes transfer temporary legal custody to any of the following:
>
>> (i) Any individual resident within or without this Commonwealth, including any relative, who, after study by the probation officer or other person or agency designated by the court, is found by the court to be qualified to receive and care for the child.
>>
>> (ii) An agency or other private organization licensed or otherwise authorized by law to receive and provide care for the child.
>>
>> (iii) A public agency authorized by law to receive and provide care for the child.
>
> (2.1) Subject to conditions and limitations as the court prescribes, transfer permanent legal custody to an individual resident in or outside this Commonwealth, including any relative, who, after study by the probation officer or other person or agency designated by the court, is found by the court to be qualified to receive and care for the child. A court order under this paragraph may set forth the temporary visitation rights of the parents. The court shall refer issues related to support and continuing visitation by the parent to the section of the court of common pleas that regularly determines support and visitation.
>
> (3) Without making any of the foregoing orders transfer custody of the child to the juvenile court of another state if authorized by and in accordance with section 6363 (relating to ordering foreign supervision).

42 Pa.C.S.A. § 6351(a). The court's disposition must be "best suited to the safety, protection and physical, mental, and moral welfare of the child." *Id.*

Before the court may remove a child from his or her parent, however, section 6351(b) requires the court to enter, *inter alia*, the following findings on the record:

> (1) that continuation of the child in his home would be contrary to the welfare, safety or health of the child; and
>
> (2) whether reasonable efforts were made prior to the placement of the child to prevent or eliminate the need for removal of the child from his home, if the child has remained in his home pending such disposition; []
>
> * * *

42 Pa.C.S.A. § 6351(b)(1), (2). Thus, in accordance with section 6351(b), "even after a child properly has been determined to be dependent […] [r]emoval may be ordered only where the evidence demonstrates a clear necessity for removal." *In re A.L.*, 779 A.2d 1172, 1175 (Pa. Super. 2001). "Such necessity is implicated where the welfare of the child demands that he [or she] be taken from his [or her] parents' custody." *In re J.J.*, 69 A.3d 724, 730 (Pa. Super. 2013) (citing *In re G.T.*, 845 A.2d 870, 873 (Pa. Super. 2004)).

In this case, the juvenile court stated at the conclusion of the permanency review hearing that removing A.L. from Mother's home would be in the child's best interest. N.T., 1/14/14, at 629-30. Mother argues that the juvenile court abused its discretion in removing A.L. from her home by "applying the best interest standard and not the clearly necessary standard

- 17 -

as required." Mother's Brief at 22. Mother asserts that had the juvenile court applied the clearly necessary standard, the evidence of record would be insufficient to satisfy the standard because the child's basic needs are met, the child is bonded with Mother, and Mother complied with every court order and followed the recommendations of the child's therapists. *Id.* at 22-23.

We begin by noting that although the juvenile court used the words "best interest," it stated the proper "clear necessity" standard in its written opinion. Juvenile Court Opinion, 4/23/14, at 13. Furthermore, the juvenile court employed the "clear necessity" standard in deciding to remove A.L. from Mother's care. It found that "the status quo was posing a real danger to the child" and to the child's mental health. *Id.* The juvenile court also found that Mother has manipulated A.L. "to such an extreme that she will say and do almost anything." *Id.* at 9. The juvenile court concluded that "removal of [A.L.] was the last resort but the only choice at the hearing" and that "removal to prevent further emotional harm was necessary." *Id.* at 10, 13.

The record supports this determination. Testimony at the permanency review hearing revealed that A.L.'s disclosures of abuse are "always in the same sequence. It goes from daddy hit me in the head with a shoe to [he] put his finger in my bum and vagina, and then the next step is he put yogurt

on my back[4] and he has germs on his hands." N.T. 1/10/14, at 175. In addition, despite A.L.'s allegations that Father made her suck his penis, A.L. stated that she had never seen a penis and could not describe a penis when questioned. *Id.* at 176. Moreover, although Mother testified that she did not coach A.L., she admitted that after A.L. disclosed the October 15, 2013 incident wherein Father stuck his hands down her pants in front of the CYS case aide, she told A.L. that she was proud of her, called the police to report the incident, crying hysterically, and subjected A.L. to a forensic interview, even though Mother did not believe this reported abuse occurred. N.T., 1/14/14, at 383-85.

A CYS caseworker testified at the permanency review hearing that A.L.'s well-being and emotional health has gotten worse as the case has gone on. N.T., 1/10/14, at 208-09. A.L. would repeatedly have outbursts while playing with Father, accusing him of hurting her or lying to her. *See id.* at 51; N.T., 1/14/14, at 459-59. These outbursts culminated one week prior to the permanency review hearing, when A.L. had a meltdown during a visit with Father. A.L. suddenly got up from watching cartoons with her Father and began yelling that Father lied to her, that he is still lying to her, and that he hurt her when she was two years old. N.T., 1/10/14, at 62.

---

[4] Dr. Ventura testified that A.L. disclosed to her that Father "made her take her clothes off and he had smeared, in her words, yogurt on her face and on her body." N.T., 1/14/14, at 518-19. When Dr. Ventura asked her if it was the same yogurt that she eats for breakfast, "[s]he said, no, it wasn't what I eat for breakfast, it was yucky…it looked like yogurt and I don't want to talk about it anymore." *Id.* at 519.

She then ran down the hallway, ripped the bedding off Father's bed, dumped a cup of pens, ran to other rooms in the house and dumped her toys. *Id.* at 62-63. A.L. went to the spare bedroom, laid on the bed, took a few deep breaths, jumped off the bed, and began cleaning her toys up, and proceeded as if nothing had happened. *Id.* at 64.

There have been 18 reports of abuse against Father with A.L. as the victim. N.T., 1/10/14, at 204; Juvenile Court Opinion, 4/23/14, at 11.[5] By Mother's own admission, the majority of these reports were unfounded, and those that were at one time indicated were subsequently expunged. Mother's Brief at 11. A.L. has received counseling from four separate people and has been interviewed by the Child Advocacy Center 10 times. N.T., 1/14/14, at 625. Despite the counseling and reunification efforts, there has been no progress in the case. In fact, the record reflects that there has been a decline in progress and in A.L.'s emotional health. After our review of the record, we conclude that the record supports the juvenile court's determination that the status quo was posing a danger to A.L. and that removing her from the Mother's home was necessary.

Further, in accordance with the requirements of section 6351(b)(2), the juvenile court found that reasonable efforts were made to prevent the removal of A.L. from Mother's home, but "that Mother's goal is to remove Father from his child's life." Juvenile Court Opinion, 4/23/14, at 13. The

---

[5] The trial court opinion states that there have been 17 reports of abuse, but the record reflects that there have been 18, as stated herein.

juvenile court found that the court, CYS, the guardian *ad litem*, and the Court Appointed Special Advocate ("CASA") encouraged Mother to facilitate a relationship between Father and A.L. Juvenile Court Opinion, 4/23/14, at 12-13. Both Mother and Father participated in individual counseling. ***Id.*** at 10. In addition, the juvenile court found that efforts by CYS to provide reunification therapy and provide supervised visits were reasonable. Juvenile Court Opinion, 4/23/14, at 13.

We find the record supports the trial court's determination that reasonable efforts were made to prevent the removal of A.L. from Mother's home. A.L., Mother, and Father received support and services for more than six months leading up to the permanency review hearing. Try Again Homes provided in home services for Mother, albeit unsuccessfully. N.T., 6/26/13, at 6; N.T., 9/24/13, at 64. Nevertheless, despite all of these services, A.L.'s emotional health and safety continued to decline and reunification efforts between A.L. and Father were unsuccessful.

Therefore, despite the juvenile court's improper use of the words "best interest," the record supports the juvenile court's decision to remove A.L. from Mother and place her with relative foster care based on a clear necessity pursuant to 42 Pa.C.S.A. § 6351(b). Accordingly, we conclude that the juvenile court did not err.

For her fourth and final issue on appeal, Mother argues that the juvenile court erred and abused its discretion in admitting into evidence and

placing weight on Dr. Rosenblum's report. Mother's Brief at 25. The record reflects that at the permanency review hearing, the guardian *ad litem* questioned Dr. Ventura with regard to the substance of Dr. Rosenblum's report, specifically questioning Dr. Ventura on their differing approaches and conclusions on the case. N.T., 1/14/14, at 565, 567-70. Mother's counsel objected to the questioning, stating that the report was not offered into evidence at the September 24, 2013 review hearing. *Id.* at 565. Mother did not stipulate to Dr. Rosenblum's report, but only stipulated to follow the recommendations of the report. *Id.* at 565-66. After the guardian *ad litem* pointed out that the report was court ordered, the juvenile court stated, "I'll – if it hasn't been admitted, I would allow it to be introduced." *Id.* at 567. Dr. Rosenblum's report was thereafter marked for identification and admitted into the record. *Id.* On appeal, Mother argues that the report should not have been admitted into evidence because the report was hearsay, Dr. Rosenblum was not called as a witness, and Dr. Rosenblum was not subjected to cross-examination. *Id.* at 25-27.

As this Court has held, "[i]t is well settled that questions concerning the admission or exclusion of evidence are within the sound discretion of the trial court and will be reversed on appeal only where a clear abuse of that discretion exists." *In re A.H.*, 763 A.2d 873, 880 (Pa. Super. 2000) (citing *In re M.K.*, 636 A.2d 198, 203 (Pa. Super. 1994)). In the instant matter,

the record reflects that the trial court did not abuse its discretion in admitting Dr. Rosenblum's report.

"The Juvenile Act permits broad discretion in the admission of evidence in dependency proceedings." *In re A.H.*, 763 A.2d at 880. The Juvenile Act provides:

> (1)(i) In disposition hearings under subsections (b) and (c) all evidence helpful in determining the questions presented, including oral and written reports, may be received by the court and relied upon to the extent of its probative value even though not otherwise competent in the hearing on the petition.
>
> > (ii) Subparagraph (i) includes any screening and assessment examinations ordered by the court to aid in disposition […]
>
> (2) The parties or their counsel shall be afforded an opportunity to examine and controvert written reports so received and to cross-examine individuals making the reports. Sources of information given in confidence need not be disclosed.

42 Pa.C.S.A. § 6341(d)(1), (2).

Given the juvenile court's broad discretion under section 6341(d), we do not find any error in admitting Dr. Rosenblum's report. The juvenile court found that Dr. Rosenblum's "report was received by the [c]ourt and any party could have called the witness." Juvenile Court Opinion, 4/23/14, at 15. In addition, the juvenile court never prevented Mother or any other party from calling Dr. Rosenblum as a witness to testify. *Id*.

The cases cited by Mother do not convince us that the juvenile court abused its discretion. In her brief, Mother cites to **Coble v. Coble**, 470 A.2d 1002 (Pa. Super. 1984), a case regarding a custody proceeding, in which the Juvenile Act in general, and specifically, its relaxed evidentiary standard, does not apply. **See** Mother's Brief at 26. Mother also cites to **In the Interest of Leslie H.**, 478 A.2d 876 (Pa. Super. 1984) and **In the Interest of Jones**, 429 A.2d 671 (Pa. Super. 1981) which involved the trial court preventing the appellants from having an opportunity to cross-examine and/or confront the witnesses whose testimony the trial court relied upon in making its decision. **See** Mother's Brief at 27. Accordingly, these cases are inapplicable to the present matter.

However, even assuming that Mother is correct that admitting the report was improper, we find that she is not entitled to relief, as the error was harmless. **Commonwealth v. Hardy**, 918 A.2d 766, 777 (Pa. Super. 2007) ("Even if a court does wrongly admit hearsay, this Court will not disturb a verdict on that basis alone if the admission constitutes harmless error.")

> Error is harmless if: (1) the prejudice to the appellant was nonexistent or *de minimis*; (2) the erroneously admitted evidence was merely cumulative of other untainted, substantially similar and properly admitted evidence; or (3) the properly admitted and uncontradicted evidence was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

- 24 -

***Hardy***, 918 A.2d at 777 (citing ***Dent***, 837 A.2d at 582 n.2).

In this case, we conclude that any error in admitting Dr. Rosenblum's report was harmless, as the prejudice to Mother was nonexistent or *de minimis*. There is nothing in the record that suggests the trial court relied upon Dr. Rosenblum's report in reaching its decision. To the contrary, the juvenile court found that Father did not abuse A.L. and that Mother conditioned or manipulated A.L. to believe that Father abused her, neither of which findings were made by Dr. Rosenblum. Juvenile Court Opinion, 4/23/14, at 15. Furthermore, the juvenile court did not find Dr. Ventura's testimony to be believable or credible because she "never considered the possibility that Father did not abuse [A.L.]" and because she "accepted as true all that Mother reported," not based on the guardian *ad litem*'s questioning of Dr. Ventura regarding Dr. Rosenblum's report. Moreover, Dr. Rosenblum did not recommend removing A.L. from Mother's care. Thus, the record reflects that admission of Dr. Rosenblum's report did not prejudice Mother or the prejudice was *de minimis*.

Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/03/2014

- 25 -