J. S64002/15 & J. S64003/15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE:  ADOPTION OF:  M.G. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| APPEAL OF:  A.G., FATHER | : | |
| | : | No. 968 MDA 2015 |
| Appellant | : | |

Appeal from the Order Entered May 8, 2015,
in the Court of Common Pleas of Cumberland County
Juvenile Division at No. CP-21-DP-0000092-2013

| | | |
|---|---|---|
| IN RE:  ADOPTION OF:  M.G. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| APPEAL OF:  A.G., FATHER | : | |
| | : | No. 969 MDA 2015 |
| Appellant | : | |

Appeal from the Order Entered May 8, 2015,
in the Court of Common Pleas of Cumberland County
Juvenile Division at No. CP-21-DP-0000206-2013

| | | |
|---|---|---|
| IN RE:  ADOPTION OF:  M.G. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| APPEAL OF:  A.G., FATHER | : | |
| | : | No. 970 MDA 2015 |
| Appellant | : | |

Appeal from the Order Entered May 8, 2015,
in the Court of Common Pleas of Cumberland County
Juvenile Division at No. CP-21-DP-93-2013

| | | |
|---|---|---|
| IN RE:  ADOPTION OF:  M.G. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| APPEAL OF:  A.G., FATHER, | : | |
| | : | No. 986 MDA 2015 |
| Appellant | : | |

J. S64002/15 & J. S64003/15

Appeal from the Decree, May 8, 2015,
in the Court of Common Pleas of Cumberland County
Orphans' Court Division at No. 9 Adoptions 2015

IN RE:  ADOPTION OF:  M.G.          :       IN THE SUPERIOR COURT OF
                                    :           PENNSYLVANIA
APPEAL OF:  A.G., FATHER,           :
                                    :          No. 987 MDA 2015
                Appellant           :

Appeal from the Decree, May 8, 2015,
in the Court of Common Pleas of Cumberland County
Orphans' Court Division at No. 10 Adoptions 2015

IN RE:  ADOPTION OF:  M.G.          :       IN THE SUPERIOR COURT OF
                                    :           PENNSYLVANIA
APPEAL OF:  A.G., FATHER,           :
                                    :          No. 988 MDA 2015
                Appellant           :

Appeal from the Decree, May 8, 2015,
in the Court of Common Pleas of Cumberland County
Orphans' Court Division at No. 11 Adoptions 2015

BEFORE:  FORD ELLIOTT, P.J.E., WECHT AND FITZGERALD,[*] JJ.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:          **FILED NOVEMBER 02, 2015**

Appellant, A.G. ("Father"), appeals from the orders entered in the Cumberland County Court of Common Pleas, granting appellee's, Cumberland County Children and Youth Services ("the Agency"), petitions

---

[*] Former Justice specially assigned to the Superior Court.

- 2 -

for goal change from reunification to adoption, and from the decrees involuntarily terminating Father's parental rights as to his minor children, M.G., M.G., and M.G. ("the Children").[1] Upon a thorough review of the record and the applicable law, we affirm.

We adopt the factual history as summarized by the trial court:

> A.G. is the biological father of three daughters who share the same initials. They are all under the age of 5. The eldest child was born [] 2011, the middle child [] 2012, and the youngest child [] 2013.
>
> The older two children were found to be dependent on May 6, 2013 as a result of their parents' drug abuse. The drugs being abused by Father included marijuana, cocaine, and various opiates, including heroin. The children were placed in the care and custody of their maternal grandmother. The parents were directed to obtain drug and alcohol evaluations, comply with treatment recommendations, and participate in a parenting program. All contact between the parents and children was to be supervised by maternal grandmother.
>
> In July 2013[,] the Agency was informed that Mother had taken the children from maternal grandmother's home to live with her. At first maternal grandmother tried to cover for Mother, but she eventually confirmed that mother and the children had left her home. On July 18, 2013[,] the two older children were placed in the care and custody of the Agency for placement in the foster home of T.L. and W.L., where they have been ever since.
>
> The youngest daughter was born on [] 2013. Since neither Mother nor Father had obtained any

---

[1] We consolidated these six appeals and listed them consecutively before the same panel for disposition.

treatment for their drug abuse, nor had either participated in a parenting program, the child was found to be dependent. She was discharged from the hospital on November 9, 2013 into the same foster home as her sisters.

Father continued to abuse drugs right up until his latest incarceration in December of 2014. He had very little contact with the children prior to this current incarceration. In fact, he did not see them at all between February 2014 and January 2015. Nor did he pay any child support. Once he became incarcerated[,] he took advantage of the visitation program offered by the Agency at the prison.

From the time of placement until his incarceration in December 2014, Father had little contact with the Agency and had made no progress toward reunification. He did not obtain a drug and alcohol evaluation until after he was jailed in December 2014. He has been participating in intensive outpatient counselling while at the prison. He was eligible for parole sometime toward the end of June 2014.

Father's mother presented herself as a resource for the children in November of 2014. She was unavailable prior to that time because of health issues. She still has numerous health issues including emphysema and congestive heart failure which requires her to be on oxygen, as well as stage 3 chronic kidney diseases and diabetes. The two older girls along with their parents resided with paternal grandmother for several months in 2012. In fact[,] the middle child was born while the parents were living with her.

The children are thriving in the foster home. At the time of our order[,] the two older children had resided in the foster home for almost 22 months. The youngest child has lived there her entire life. They live with the foster parents, as well as their two sons and two daughters. They love and are loved by

> their foster family. To all three children the foster
> parents are their "mommy and daddy."

Trial court opinion, 7/10/15 at 1-4 (internal citations omitted).

On February 18, 2015, the Agency filed petitions to involuntarily terminate Father's parental rights pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(2), (5), (8) and (b). Petitions to change goal from reunification to adoption were filed on April 23, 2015. A hearing was held on May 8, 2015, after which the petitions were granted.[2] Father filed the instant timely appeals.[3]

Father raises the following issues for our consideration:

> [1.] Did the Trial Court err as a matter of law and abuse its discretion in determining that [the Agency] presented evidence so clear, direct, weighty, and convincing as to enable the fact finder to come to a clear conviction without hesitancy, of the truth of the precise facts in issue?
>
> [2.] Did the Trial Court err as a matter of law and abuse its discretion in determining the best interests of the children would be served by changing the permanency goal from reunification to adoption, when the evidence

---

[2] The Agency's petitions to involuntarily terminate Father's parental rights were granted under all three sections, Sections 2511(a)(2), (5) and (8), as to the two older children. The youngest child never lived with Father; consequently, Sections 2511(a)(5) and (8) did not apply. However, Section 2511(a)(2) did apply and was the basis under which Father's parental rights were terminated.

[3] Mother's parental rights were terminated on May 8, 2015. She has not filed an appeal from the trial court's goal change orders or decrees terminating her parental rights.

indicated that family resources were available and could provide for the children's needs?

[3.] Did the Trial Court err as a matter of law and abuse its discretion in determining the best interests of the children would be served by changing the goal to adoption; terminating Father's parental rights; and keeping the children in foster care, when the evidence indicated that paternal grandmother and aunt, with whom the children have a significant bond, presented as an available resource to care for the children together?

Father's brief at 5.

The issues presented on appeal all concern the dependency aspect of this case, as Father argues the trial court erred when it approved the goal change from reunification to adoption.[4] The Juvenile Act controls the disposition of dependent children. *In re R.P.*, 957 A.2d 1205, 1217 (Pa.Super. 2008). Our scope and standard of review in dependency cases is well established:

> When we review a trial court's order to change the placement goal for a dependent child to adoption, our standard is abuse of discretion. In order to conclude that the trial court abused its discretion, we must determine that the court's judgment was manifestly unreasonable, that the court did not apply the law, or that the court's action was a result of partiality, prejudice, bias or ill will, as shown by the record. We are bound by the trial court's findings of fact that have support in the record. The trial court,

---

[4] Father sets forth three issues for review; however, his arguments are not divided into separate sections. We note with disapproval that Father's brief fails to comply with the Rules of Appellate Procedure; in particular, Rule 2119(a) ("The argument shall be divided into as many parts as there are questions to be argued[.]"). *See* 42 Pa.C.S.A. § 2119.

> not the appellate court, is charged with the responsibilities of evaluating credibility of the witnesses and resolving any conflicts in the testimony. In carrying out these responsibilities, the trial court is free to believe all, part, or none of the evidence. When the trial court's findings are supported by competent evidence of record, we will affirm even if the record could also support an opposite result.

*In re A.K.*, 936 A.2d 528, 532-533 (Pa.Super. 2007). "In a change of goal proceeding, the best interests of the child, and not the interests of the parent, must guide the trial court, and the parent's rights are secondary. The burden is on the Agency to prove the change in goal would be in the child's best interest." *In the Interest of D.P.*, 972 A.2d 1221, 1227 (Pa.Super. 2009), *appeal denied*, 601 A.2d 702 (Pa. 2009) (citations omitted). In *In re N.C.*, 909 A.2d 818 (Pa.Super. 2006), this court stated:

> Placement of and custody issues pertaining to dependent children are controlled by the Juvenile Act, [42 Pa.C.S.A. §§ 6301-6365] which was amended in 1998 to conform to the federal Adoption and Safe Families Act ("ASFA") [42 U.S.C. § 671 et seq.] **The policy underlying these statutes is to prevent children from languishing indefinitely in foster care, with its inherent lack of permanency, normalcy, and long-term parental commitment.** Consistent with this underlying policy, the 1998 amendments to the Juvenile Act, as required by the ASFA, place the focus of dependency proceedings, including change of goal proceedings, on the child. **Safety, permanency, and well-being of the child must take precedence over all other considerations, including the rights of the parents.**

*Id.* at 823 (citations and footnotes omitted) (emphasis added).

When considering a petition for goal change for a dependent child, the trial court considers: (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the service plan developed for the child; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; and (5) a likely date by which the goal for the child might be achieved. *A.K.*, 936 A.2d at 533, citing 42 Pa.C.S.A. § 6351(f).

> When the child welfare agency has made reasonable efforts to return a foster child to his or her biological parent, but those efforts have failed, then the agency must redirect its efforts towards placing the child in an adoptive home. This Court has held that the placement process should be completed within 18 months.
>
>> Pennsylvania . . . [is] required to return the child to [his or her] home following foster placement, but failing to accomplish this due to the failure of the parent to benefit by . . . reasonable efforts, [the Commonwealth is then required] to move toward termination of parental rights and placement of the child through adoption . . . . [W]hen a child is placed in foster care, after reasonable efforts have been made to reestablish the biological relationship, the needs and welfare of the child require [the child welfare agency] and foster care institutions to work toward termination of parental rights, placing the child with adoptive parents. It is contemplated [that] this process realistically should be completed within 18 months.

> *Id.* at 975-976 quoting *In re B.L.L.*, 787 A.2d 1007, 1016 (Pa.Super. 2001). While this 18-month time frame may in some circumstances seem short, it is based on the policy that "[a] child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *In re Adoption of M.E.P.*, 825 A.2d 1266, 1276 (Pa.Super. 2003).
>
> > A placement goal change to adoption does not terminate the parents' rights; however, it is a step in that direction. *In re A.L.D.,* 797 A.2d 326, 339 (Pa.Super. 2002).
> >
> > By allowing [the Agency] to change its goal to adoption, the trial court has decided that [the Agency] has provided adequate services to the parent but that he/she is nonetheless incapable of caring for the child and that, therefore, adoption is now the favored disposition.
>
> *Id.* (quotation and citation omitted).

*In re N.C.*, 909 A.2d at 823-824.

In his first argument, Father claims the evidence did not support the goal change. More specifically, Father argues the original reasons for the Children's placement were in the process of being eliminated, and as such, the goal should not have been changed to adoption. (Father's brief at 12.) The original reasons for placement were primarily related to Father's and Mother's drug use, and Father contends he was addressing his drug usage by undergoing a drug and alcohol evaluation and engaging in intensive outpatient counseling while in prison. (*Id.*)

- 9 -

While drug use by Father and Mother initially brought this case to the attention of the Agency, the family had other issues that needed to be addressed before the Children could be returned. The record indicates that a family service plan ("FSP") was created for the family on May 6, 2013, and revised on November 10, 2014. Father was directed to: obtain a drug and alcohol evaluation with the Agency's input to the provider, follow the recommendations for treatment, and cooperate with random drug screens; cooperate with a parenting assessment and follow any recommendations; obtain and maintain stable housing; cooperate with the Agency; maintain a positive relationship with the Children; and cooperate with any criminal matters.

According to Caseworker Courtney Salmon, Father began drug testing in March of 2013. He tested positive for marijuana and morphine on March 5, 2013. (Notes of testimony, 5/8/15 at 33.) He tested positive for marijuana, cocaine, morphine, oxycodone, and heroin on March 22, 2013. (***Id.***) On April 15, 2013, Father tested positive for marijuana, morphine, and hydromorphone. (***Id.***). Father had two negative screens on May 6, 2013 and October 7, 2013. (***Id.***) Father did not appear for two tests scheduled on January 7, 2014 and September 30, 2014. (***Id.***) Father was incarcerated in February of 2014. (***Id.*** at 33-34). His release date was not clear, but the Agency attempted to reach him by telephone in May, June, July, September, and October of 2014. (***Id.*** at 34). The Agency did not

have an address for him. (*Id.*) There was one telephone contact in October 2014 with Father, and he hung up on Ms. Salmon. (*Id.*)

After being incarcerated again in December of 2014, Father finally initiated a drug and alcohol evaluation which took place on February 25, 2015. (*Id.*) It was recommended that he participate in extensive outpatient counseling. (*Id.*) Ms. Salmon testified that she was informed by Andrea Janssen at the prison that Father started group sessions on April 6, 2015. (*Id.*)

On May 6, 2013, Father was ordered to complete a parenting assessment. (*Id.*) By June 6, 2013, the parenting service provider was unable to reach him and discharged him from the service. (*Id.* at 35.) In September of 2014, Father was recommended to participate in a parenting psychological evaluation. (*Id.*) The service provider spoke to Father on October 27, 2014. Father informed the provider he was not going to participate because he was wanted by the police. (*Id.*)

As to stable housing, Father resided with Mother and the Children in Mother's grandparent's home at the beginning of this case. By September of 2013, Father's whereabouts were unknown until his incarceration in February of 2014. (*Id.* at 33, 36). The Agency did not know where Father was residing after his release until his re-incarceration in December of 2014. (*Id.* at 36).

Another goal for Father was to cooperate in any criminal matters. During the 22 months from the Agency's initial involvement to the hearing on May 8, 2015, Father spent much of the time incarcerated. When out of prison, Father kept his whereabouts secret in order to avoid being picked up on bench warrants. (*Id.* at 34-35.)

Father's last goal was to maintain a positive relationship with the Children. Father did not see the Children from December of 2013 until his incarceration in December of 2014. Since December of 2014, Father has had bi-weekly 45-minute visits while in prison. (*Id.* at 37.)

It is clear that Father's inability to parent the Children cannot be remedied in the near future. The trial court noted that Father did not take any steps toward remedying his drug addiction until after he was incarcerated, and he has a long way to go to overcome his addiction. (Trial court opinion, 7/10/15 at 7.) The trial court further observed, "Whether [Father] will eventually be able to manage his addiction remains to be seen. He has just taken the first steps." (*Id.*)

While Father may have taken the first step in addressing his drug addiction, the fact remains that Father is unable to care for the Children. To allow Father additional time to resolve his parental deficiencies ignores the express mandates of the ASFA, which requires resolution within an 18-month period. Based on this record, the evidence supports the goal change.

Next, Father argues it was not in the Children's best interest to change the goal to adoption. Children require permanency and security. Two of the Children have been in foster care for 22 months; the third child for 16 months. All three children are living with the same foster family, which is a pre-adoptive home for all of them. The youngest child was discharged from the hospital at birth to the current foster family and has spent her entire life with them. According to the trial court, "[T]he children have been well cared for by the foster parents. They met all of the girls' physical and emotional needs which Father's drug addiction prevented him from doing." (*Id.* at 6.) Additionally, the trial court stated the Children were happy, healthy, well cared for, and fully assimilated into the foster family. (*Id.* at 7.)

Based on the testimony presented at the May 8, 2015 hearing, the trial court was within its purview to conclude that the best interests of the Children, in light of their permanency needs, was for the goal to be changed to adoption. As that decision is properly supported in the record, we are not free to disturb it on appeal. As such, we reject Father's first claim on appeal. *See Baehr v. Baehr*, 889 A.2d 1240, 1245 (Pa.Super. 2005) (stating that the trial court, as the finder-of-fact, is entitled to weigh evidence and assess credibility).

Last, Father argues his mother should have been considered as a placement resource to care for the Children. According to Father, the

Agency dismissed his mother as a placement resource and immediately looked to foster care without fully investigating the nature of her health conditions. Father claims he was looking at a parole date in June of 2015, and his plan was to return to his mother's residence in Pittsburgh to help her care for the Children. (Father's brief at 13.)

The record indicates that when the Children were first placed, Father's mother ("K.S.H.") was unable to be a resource due to health concerns. According to K.S.H., she initially contacted the Agency in September of 2013 to take custody of the Children, but she was hospitalized in November of that year for five months which prevented her from taking the Children. (*Id.* at 85.) K.S.H. testified that she has emphysema, pulmonary embolism, systolic heart failure (for which she has a defibrillator in her heart), congestive heart failure, and diabetes which is under control. (*Id.* at 91-92.) She testified she receives Social Security disability of $755 per month. (*Id.* at 87). Additionally, K.S.H. receives food stamps, regularly visits various food banks in the Pittsburgh area for assistance, and receives financial help from her daughter and other family members. (*Id.* at 86-87.) K.S.H. testified that she presented herself again on September 21, 2014, as a resource after learning Mother's reunification with the Children had fallen apart. (*Id.* at 98-99.)

The trial court addressed the issue of K.S.H. as a resource for the Children as follows:

We did not view [K.S.H.] as a viable resource for the Children because of her many health concerns. Even though she downplayed those concerns, we were satisfied the grandmother could not adequately care for three girls under the age of 5, even with the help of her own daughters (who each have families of their own).

However, even if we found that [K.S.H.] would be a viable resource, we were satisfied that the best interest of the children would be to allow them to remain with the foster family. [K.S.H.] did not present as a resource until November of 2014. By that time, the children had formed a deep and loving bond with the foster family. To break that bond and to place the children in a strange environment would not be good for their emotional well-being.[Footnote 22].

[Footnote 22] While the older two children had lived in [K.S.H.'s] home for a few months when they were very young, they had been with the foster family for almost two years. For most of that time there was little or no contact with Father or his side of the family.

Trial court opinion, 7/10/15 at 8.

It is admirable that K.S.H. would like to be a resource for the Children. However, she clearly faces significant health concerns and has limited finances. Long-term placement of the Children with K.S.H. would be uncertain at best. Meanwhile, the Children are thriving and have a bond with the foster family who wishes to adopt them. The Agency has provided ample support that it is in the best interest of the Children to remain in their current foster home placement. We discern no abuse of discretion.

Accordingly, we affirm the trial court's orders changing the Children's permanency goal to adoption.

Because Father fails to present any argument regarding the decrees terminating his parental rights, the decrees are hereby affirmed.

Orders and decrees affirmed.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/2/2015