J-S66016-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.M., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: L.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1339 EDA 2018 |

Appeal from the Order Entered March 26, 2018
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):  CP-51-DP-0002333-2017

BEFORE:  GANTMAN, P.J., PANELLA, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY PANELLA, J.                    **FILED NOVEMBER 09, 2018**

L.M. ("Mother") appeals from the order entered March 26, 2018, finding that aggravated circumstances existed against Mother as to her minor daughter, J.M. ("Child"), born in February 2004, and that she had committed child abuse.[1] We affirm.

Child was admitted to Children's Hospital of Philadelphia ("CHOP") for over a month in February 2017 through March 2017 with symptoms of vomiting, abdominal pain, weakness, dehydration, and weight loss. *See* N.T., Hearing, 9/6/17, at 41-43. Prior to this hospitalization, Child had been healthy. *See* N.T., Hearing, 3/26/18, at 105. Child was diagnosed with rumination

---

[1] The court did not make a finding of child abuse or aggravated circumstances as to Child's biological father, R.T. ("Father"), a non-custodial parent.

syndrome, a form of conversion disorder.[2] *See* N.T., Hearing, 9/6/17, at 43. CHOP recommended intensive behavioral health treatment and transferred Child to the Medical-Behavioral Unit ("MBU"). Mother, a nurse, resisted this transfer and demanded unnecessary medical testing and medication. *See id*., at 49-54, 60. CHOP eventually moved Child back to general pediatrics due to Mother's lack of cooperation with the MBU recommended treatment. *See id*., at 54-56. When Mother eventually agreed to comply with recommended treatment for Child, CHOP discharged Child to Mother's care. *See id*., at 58-60.

Following the discharge, Mother brought Child to a single outpatient psychological appointment. *See id*., at 61-62. Child's condition continued to deteriorate to the point where she could not walk without assistance. *See id*., at 69. In May 2017, Child was admitted to Nemours Alfred Dupont Hospital ("Nemours"), where, after undergoing a spinal tap and blood tests, she was diagnosed with conversion disorder, manifesting in an abnormal gait and pseudo-seizures. *See id*., at 63-64, 71-72, 80. Mother did not accept this diagnosis and continued to insist that Child be given medication. *See id*., at 71, 75-76, 80. During Child's time at Nemours, Mother stated that the hospital was killing Child by not giving her medication. *See id*., at 76-78.

---

[2] Rumination syndrome is a psychiatric condition where patients force themselves to vomit; conversion disorder is, likewise, a psychiatric condition which may include vomiting, pseudo-seizures, or the inability to walk. *See id*.

Nemours transferred Child to Pittsburgh Children's Institute ("PCI") for treatment for her conversion disorder, where she was additionally diagnosed with hypermobility, or Ehlers-Danos Syndrome Type 3.[3] *See id*., at 78-80. This syndrome is non-pathologic and does not affect the gastrointestinal system. *See* N.T., Hearing, 3/26/18, at 22, 34, 65-66. Child was treated at PCI for approximately one month and discharged to Mother's care in July 2017. *See* N.T., Hearing, 9/7/17, at 78-80.

In late July 2017, Child began seeing a new primary care physician and was seen by the CHOP Diagnostic Center, both of whom expressed concerns with Mother's continued demands for increased medical intervention, testing, and pain medication. *See id*., at 80-81. By this point Child was wheelchair-dependent. *See id*.

On August 3, 2017, CHOP admitted Child after she stopped speaking and moving voluntarily. *See id*., at 84. Following an evaluation by several specialists, Child was again diagnosed with conversion disorder and the EDS diagnosis was confirmed. *See id*., at 83. Child's condition worsened, and she required a nasogastric tube for feeding, was wearing a diaper, and could not complete any activities of daily living. *See id*., at 83-84.

_____

[3] "Hypermobile Ehlers-Danlos syndrome is an inherited connective tissue disorder that is caused by defects in a protein called collagen." U.S. Department of Health, National Institute of Health, Hypermobile Ehlers-Danlos syndrome, available at https://rarediseases.info.nih.gov/diseases/2081/hypermobile-ehlers-danlos-syndrome (last visited October 31, 2018).

Mother continued to obstruct psychological care and Child's condition worsened in Mother's presence. *See id*., at 86-87. Child suffered pseudo-seizures only in Mother's presence, and was more compliant with treatment when Mother was not present. Mother insisted on further unnecessary testing and medication, including cardiac monitoring and anti-seizure medications. *See id*., at 86-88.

On August 23, 2017, the Department of Human Services ("DHS") received a general protective services report regarding Child, Mother, and Child's medical issues. The report further alleged that Mother had obstructed and refused treatment for Child, and requested increased medical interventions despite being told that Child's symptoms were psychological in nature. Mother had a history of anxiety disorder and there were concerns of medical neglect and child abuse by Mother, specifically, Munchausen Syndrome by Proxy.[4] On August 25, 2017, the report was upgraded to a child protective services ("CPS") report.

On August 29, 2017, DHS, upon application, obtained an order for protective custody ("OPC"). A shelter care hearing was scheduled and, on August 31, 2017, the trial court lifted the OPC and ordered Child's temporary

_____

[4] "Factitious disorder imposed on another … formerly Munchausen syndrome by proxy … is a mental illness in which a person acts as if an individual he or she is caring for has a physical or mental illness when the person is not really sick." Cleveland Clinic, Factitious Disorder Imposed on Another, https://my.clevelandclinic.org/health/diseases/9834-factitious-disorder-imposed-on-another-fdia, available at last visited (October 31, 2018).

commitment to DHS to stand. Mother was to have no contact with Child, who was placed in a CHOP medical facility.

On September 6, 2017, DHS filed a dependency petition alleging child abuse and aggravated circumstances. The next day, the court began hearing evidence regarding the dependency petition and the requested findings. Dr. Phil Scribano, a pediatrician who observed Child during her hospitalizations at CHOP, testified regarding those hospitalizations. *See* N.T., Hearing, 9/7/17, at 41-103. Dr. Scribano testified that, in his expert opinion, based on the facts above, Child was the victim of medical child abuse via Munchausen Syndrome by Proxy. *See id*., at 89-92. Since being separated from Mother and provided with intensive psychiatric and psychological treatment, Child has shown some improvement, although time would be needed to get her stabilized. *See id*. Dr. Scribano believed that Child's improvement would be impossible in the presence of Mother. *See id*.

On December 1, 2017, following an additional hearing, the court adjudicated Child dependent.[5]

On March 26, 2018, the court held a permanency review hearing and took further evidence regarding the aggravated circumstances and child abuse allegations. Dr. Scribano appeared once more for cross-examination. Additionally, Adrienne Redguard, DHS social worker, testified for DHS. Ms.

---

[5] The notes of testimony from the December 1, 2017 hearing are not included in either the certified or the reproduced record. As Mother does not challenge the court's finding of dependency, our analysis is unaffected.

Redguard testified that she spoke with Child, who was still hospitalized at CHOP. *See* N.T., Hearing, 3/26/18, at 106-111. Child informed Ms. Redguard that she had a plan to harm herself if she was returned to Mother's care, and that Mother had "really f'd her up." *Id*., at 109. Child stated that prior to her illness, she had not had a close relationship with Mother, who called her stupid, dumb, and ugly; Child felt that the illness "forced" her to rely on her mother. *Id*., at 113.

Additionally, hospital summaries and records related to Child's care were admitted as exhibits. *See* DHS Exhibit 3. The summaries reveal a pattern of interference, abusive behavior, and threatening language towards hospital staff by Mother. For example, on one occasion security was called to Child's room at Nemours due to Mother's behavior. *See id*. In another incident, when informed that Child was suffering from pseudo-seizures, Mother said to the nurse, "If I punch you in the face and call it a pseudo-punch, does that make it not real?" *Id*.

Mother testified in her own defense. She stated that her relationship with Child, prior to her hospitalization, was good. *See id*., at 133-134. She stated she had always accepted the diagnosis of conversion disorder and denied interfering with Child's medical treatment or any intent to make Child sick. *See id*., at 134-68. Mother did admit to complaining on social media about the care Child received. *See id*., at 167, 183-86, 190-91.

At the conclusion of the hearing and following the argument of counsel, the court found clear and convincing evidence of child abuse under § 6303 of

- 6 -

the Child Protective Services Law ("CPSL"), 23 Pa.C.S.A. §§ 6301, et seq., and ordered the August 25, 2017 CPS report changed from indicated to founded. Additionally, the trial court found clear and convincing evidence of aggravated circumstances under § 6302 of the Juvenile Act, 42 Pa.C.S.A. §§ 6301, et seq.

Mother timely appealed and filed her statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On appeal, Mother raises the following issues for our review:

> A. Did the trial court commit reversible error when it made a finding that the child was a victim of child abuse by [Mother] as defined at 23 Pa.C.S. § 6303, where such determination was not supported by clear and convincing evidence under the Child Protective Services Law, 23 Pa.C.S. § 6303(B.1)?
>
> B. Did the trial court err in its aggravated circumstances order when it determined that there was clear and convincing evidence presented to establish aggravated circumstances for abuse of a child existed [*sic*] as to [Mother] under 42 Pa.C.S. § 6302(2)[?]

Mother's Brief, at 3.

> The standard of review in dependency cases requires an appellate court to accept findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. We review for abuse of discretion[.]

***In re L.Z.***, 111 A.3d 1164, 1174 (Pa. 2015) (quotation marks and citation omitted).

As noted, Mother does not appeal the trial court's finding of dependency. Instead, she challenges the court's findings of child abuse and aggravated circumstances.

- 7 -

"As part of the dependency adjudication, a court may find a parent to be the perpetrator of child abuse," as defined by the CPSL. *In re L.Z.*, 111 A.3d 1164, 1176 (Pa. 2015). "In cases of child abuse, a court's finding as to the identity of the abusers need only be established by prima facie evidence that the abuse normally would not have occurred except by reason of acts or omissions of the caretakers." *In re R.P.*, 957 A.2d 1205, 1217–1218 (Pa. Super. 2008) (internal quotation marks, emphasis, and citations omitted).

The CPSL defines "child abuse" as follows, in relevant part:

> **(b.1) Child abuse.--**The term "child abuse" shall mean intentionally, knowingly or recklessly doing any of the following:
>
> ***
>
> (1) Causing bodily injury to a child through any recent act or failure to act.
>
> (2) Fabricating, feigning, or intentionally exaggerating or inducing a medical symptom or disease which results in a potentially harmful medical evaluation or treatment to the child through any recent act.
>
> (3) Causing or substantially contributing to serious mental injury to a child through any act or failure to act or a series of such acts or failures to act.
>
> ***

23 Pa.C.S.A. § 6303(b.1)(1)-(3).

Bodily injury is defined as "[i]mpairment of physical condition or substantial pain." 23 Pa.C.S.A. § 6303(a). Serious mental injury is defined as "[a] psychological condition, as diagnosed by a physician or licensed psychologist, including the refusal of appropriate treatment, that: (1) renders

- 8 -

a child chronically and severely anxious, agitated, depressed, socially withdrawn, psychotic or in reasonable fear that the child's life or safety is threatened; or (2) seriously interferes with a child's ability to accomplish age-appropriate developmental and social tasks." *Id*.

In defining intentionally, knowingly, and recklessly, the CPSL refers to the Crimes Code definitions, in relevant part:

**(b) Kinds of culpability defined.--**

(1) A person acts intentionally with respect to a material element of an offense when:

(i) if the element involves the nature of his conduct or a result thereof, it is his conscious object to engage in conduct of that nature or to cause such a result; and

(ii) if the element involves the attendant circumstances, he is aware of the existence of such circumstances or he believes or hopes that they exist.

(2) A person acts knowingly with respect to a material element of an offense when:

(i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and

(ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.

(3) A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering

the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa.C.S.A. § 302(b)(1)-(3).

First, Mother claims that the court abused its discretion in finding clear and convincing evidence that Child was the victim of child abuse by Mother. Mother contends that the evidence presented at the hearing did not establish by clear and convincing evidence that she intentionally, knowingly, or recklessly caused bodily injury to Child through an act or failure to act. Mother further notes that the court did not identify which subsection of 23 Pa.C.S.A. § 6303(b.1) it relied upon to make its ruling, but that Mother does not meet the first three subsections of child abuse definitions.

Here, the trial court's opinion does not discuss the definitions and case law discussed above, nor does it note the definition under which it found Mother had committed child abuse. *See* Trial Court Opinion, 7/19/18, at 4-5. Instead, the trial court focuses on extensive fact finding and, in legal analysis, almost solely on the Juvenile Act's definition of aggravated circumstances. Nevertheless, "if the established facts support a legal conclusion producing the same outcome," an appellate court may uphold an order of the lower court for any valid reason appearing from the record. *In re A.J.R.-H.*, 188 A.3d 1157, 1176 (Pa. 2018).

We conclude that the trial court properly found that Mother committed child abuse pursuant to 23 Pa.C.S.A. § 6303(b.1)(2), "[f]abricating, feigning, or intentionally exaggerating or inducing a medical symptom or disease which results in a potentially harmful medical evaluation or treatment to the child through any recent act."

Here, Child was brought to three different hospitals over the course of a seven-month period, and she was admitted for extensive lengths of time. Child was diagnosed with conversion disorder, and intensive behavioral health and psychiatry evaluation and treatment were recommended. However, Mother refused to accept that there was not a medical explanation for Child's symptoms, and continued to interfere in her treatment, requesting more invasive testing and medications, before Child was discharged to her care.

Child was subsequently hospitalized in two additional hospitals prior to returning to CHOP; at both hospitals Mother, again, interfered with Child's treatment, refused to accept a psychological diagnosis, and was aggressive towards staff. At Nemours, Child underwent further invasive testing, including a lumbar puncture. Nevertheless, under Mother's care, Child's condition continued to deteriorate until she could no longer complete age-appropriate activities of her daily life. Mother continued to insist on unnecessary treatments and accommodations for Child such as a chair lift and pain medication. By the time of Child's August 2017 hospitalization at CHOP, Mother was insisting on anti-seizure medications and cardiac monitoring.

Overall, Child was subjected to blood tests, x-rays, ultrasounds, brain and spine MRIs, a spinal tap, and EEGs. Mother's interference was such that Child's care team barred Mother from visits and, only then, did Child begin to show some improvement.

Further, DHS presented the uncontroverted testimony of Dr. Scribano. The trial court found this testimony credible and insightful. Dr. Scribano testified with a reasonable degree of medical certainty that Child was the victim of medical child abuse and neglect through Mother's factitious disorder imposed on another, formerly Munchausen syndrome by proxy. Dr. Scribano explained the situation as follows:

> It is comprised of a caregiver who either exaggerates or embellishes or induces illness . . . . The issues often result in over-medicalization or overuse and insistence on testing and procedures and medications and diagnoses that are either unable to be confirmed by objective data or just don't exist, they're factitious . . . . And it's a debilitating illness for a child to have that exposure, and in some cases, children then start to assume that behavior and, in their belief system, come to think that there are these medical conditions that are not real for themselves . . .

N.T., Hearing, 9/7/17, at 25.

Indeed, that is what happened here. As the trial court observed,

> Mom was . . . over-medicalizing the situation. I believe Dr. Scribano when he testified that [M]other's inserting herself in the medical treatment . . . created a dynamic that made it difficult, if not impossible, for them to implement an appropriate course of treatment that would allow [Child] to improve in terms of her medical condition . . . [Mother] circumvented trying to have those [psychological] assessments done . . . . I don't even think [she was] given a fair opportunity to absolutely engage in mental health services to see if there was an improvement.  I think that mom is very smart. You know, I think that, in this particular case,

- 12 -

with her [nursing] background, that it was detrimental to the child
. . .

N.T., Hearing, 3/26/18, at 206-208. Although Mother denied interference, her denials are not consistent with the documentation of either hospital. The trial court found her testimony not credible. **See id**., at 209.

Mother, a nurse by profession, was informed by three separate hospitals and teams of doctors that Child's symptoms were psychological in nature and that extensive behavioral health treatment would be necessary, and she was informed of the consequences of not providing the recommended treatment. Rather than accepting the diagnosis, Mother, with a greater than average understanding of medical treatment and side effects, continued to take Child to different doctors, subjecting her to increased medical interventions, until Child was non-responsive, required tube feeding, and hospitalization.

Mother consciously disregarded a substantial and unjustifiable risk that Child would be harmed by her conduct. Nor would the abuse have occurred absent the actions of Mother, who was Child's primary caretaker. **See In re R.P.**, 957 A.2d at 1217–1218. Accordingly, the court did not err in finding clear and convincing evidence that Mother had committed child abuse.

Next, Mother claims that the court erred in finding that aggravated circumstances existed as to Mother. She contends that insufficient evidence was presented to establish that she intentionally caused Child physical abuse resulting in serious bodily injury or that she engaged in aggravated physical

neglect. The Juvenile Act defines "aggravated circumstances" as any one of the following, in relevant part:

> (2) The child or another child of the parent has been the victim of physical abuse resulting in serious bodily injury, sexual violence or aggravated physical neglect by the parent.

42 Pa.C.S.A. § 6302. The Act defines aggravated physical neglect as "[a]ny omission in the care of a child which results in a life-threatening condition or seriously impairs the child's functioning." ***Id***.

Here, the evidence as discussed above establishes that Child was the victim of Mother's aggravated physical neglect resulting in a serious impairment of her functioning. At the time of Child's last admission to CHOP, she was unresponsive and unable to eat, use the bathroom, or undergo any physical activities on her own. Expert medical testimony established that it was Mother's actions—questioning the conversion disorder diagnosis, preventing Child from obtaining mental health treatment, and insisting on invasive and unnecessary medical intervention—which resulted in Child's ailments. The trial court did not err in determining that aggravated circumstances existed as to Mother.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/9/18